**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**

HOWARD DAVIS, On Behalf of Himself and All
Others Similarly Situated,

        Plaintiff,

        v.

CENTRAL VERMONT PUBLIC SERVICE
CORPORATION, WILLIAM R. SAYRE, LAWRENCE
J. REILLY, ROBERT L. BARNETT, ROBERT G.
CLARKE, JOHN M. GOODRICH, ROBERT B.
JOHNSTON, ELISABETH B. ROBERT, JANICE L.
SCITES, WILLIAM J. STENGER, DOUGLAS J.
WACEK, GAZ METRO LIMITED PARTNERSHIP.,
and DANAUS VERMONT CORP.

        Defendants.

Case Number 5: 11-cv-181

**CLASS ACTION**
**COMPLAINT FOR BREACH**
**OF FIDUCIARY DUTY**

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED
2011 JUL 13 PM 2: 36
BY
DEPUTY CLERK
CLERK

## CLASS ACTION COMPLAINT

Plaintiff Howard Davis ("Plaintiff"), on behalf of himself and all others similarly situated, by his attorneys, alleges the following upon information and belief, except as to those allegations pertaining to Plaintiff which are alleged upon personal knowledge:

### INTRODUCTION

1.    Plaintiff brings this action on behalf of the holders of the common stock of Central Vermont Public Service Corporation ("Central Vermont" or the "Company") against certain officers and/or directors of the Company, and other persons and entities involved in a proposed acquisition in which Gaz Métro Limited Partnership ("Gaz"), through Gaz' wholly-owned subsidiary Danaus Vermont Corp. ("Merger Sub"), will

acquire all of the outstanding stock of Central Vermont for inadequate consideration (the "Proposed Transaction").

2.     On May 30, 2011, Central Vermont issued a press release announcing that it had entered into a definitive Agreement and Plan of Merger on May 27, 2011 (the "Fortis Merger Agreement") for FortisUS Inc. ("Fortis") to acquire Central Vermont in a deal with a total enterprise value of approximately $654.73 million, including $230 million of debt assumed and net of cash acquired (the "Proposed Fortis Transaction"). Under the terms of the Proposed Fortis Transaction, Central Vermont common shareholders would have received $35.10 per share in cash for each Central Vermont share they own.  The Proposed Fortis Transaction was expected to be completed within six to 12 months of the May 30, 2011 announcement, and the press release disclosed that Lazard Frères & Co. LLC. ("Lazard") served as financial advisor to Central Vermont in connection with the Proposed Fortis Transaction.

3.     Because the Board had failed to undertake an adequate sales process prior to agreeing to the Fortis Merger Agreement, the price offered for Central Vermont shares in the Proposed Fortis Transaction was materially lower than the intrinsic value of those shares.  Consequently, on June 23, 2011, Gaz made an unsolicited proposal to acquire, through Merger Sub, all outstanding Central Vermont shares for $35.25 per share. Thereafter, on June 27, 2011, Central Vermont announced that the Central Vermont Board of Directors (the "Board") had authorized discussions with Gaz regarding Gaz' unsolicited proposal.  Finally, on July 12, 2011, Central Vermont announced that it had terminated the Fortis Merger Agreement, thus requiring the Company to pay Fortis a $17.5 million termination fee and $2 million in expenses pursuant to the Fortis Merger

2

Agreement, and had entered into a definitive Agreement and Plan of Merger on July 11, 2011 (the "Merger Agreement") for Gaz to acquire all of the outstanding stock of Central Vermont for $35.25 per share in a deal with a total enterprise value of approximately $700 million. The increase in consideration by Gaz could have been significantly higher had the Board not hastily agreed to the inadequate offer by Fortis such that Central Vermont was required to pay $19.5 million in order to terminate the Proposed Fortis Transaction. Indeed, $19.5 million, or approximately $1.50 per share, went to Fortis rather than to Central Vermont's shareholders as a result of the Board's failure to conduct an adequate sales process.

4.      As described below, the consideration to Central Vermont common shareholders contemplated in the Proposed Transaction is insufficient and the process by which Defendants propose to consummate the Proposed Transaction is fundamentally unfair to Plaintiff and the other common shareholders of the Company. The Individual Defendants' (as defined herein) conduct constitutes a breach of their fiduciary duties owed to Central Vermont's common shareholders, and a violation of applicable legal standards governing the Individual Defendants' conduct.

5.      For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' violations of their fiduciary duties of loyalty, good faith, due care, and full and fair disclosure.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(a), (c), and (d) as Plaintiff and the defendants are citizens of and domiciled in different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.  Given that the Proposed Transaction is valued at approximately $654.73 million, the injunctive relief sought herein will exceed a sum or value of $75,000.  This action is not a collusive one to confer jurisdiction on this Court.

7.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because Central Vermont is incorporated in Vermont and is therefore a resident of this District.

## PARTIES

8.     Plaintiff currently holds shares of common stock of Central Vermont and has held such shares at all relevant times.  Plaintiff is a citizen of Maine.

9.     Defendant Central Vermont is a Vermont corporation with its principal executive offices located at 77 Grove Street, Rutland, VT 05710.  Central Vermont is the largest electric utility in Vermont, serves nearly 160,000 customers in 163 cities and towns across Vermont, and employs approximately 520 people.  It reported annual revenue of $342 million for the year 2010, and has been listed by Forbes Magazine as one of the most trusted companies in the United States for 60 straight months.

10.     Defendant William R. Sayre ("Sayre") is the Non-Executive Chairman of the Company's Board, a position he has held since 2006.  Sayre is a citizen of Vermont and resides at 28 West Street, Bristol, VT 05443.

11.     Defendant Lawrence J. Reilly ("Reilly") is President and Chief Executive Officer of Central Vermont, and has been a member of the Board since 2011. Reilly is a citizen of Massachusetts and resides at 4 Clydesdale Lane, Hopkinton, MA 01748.

12.     Defendant Robert L. Barnett ("Barnett") has been a member of the Board since 1996. Upon information and belief, Barnett is a citizen of Illinois and resides at 1445 South Ridge Road, Lake Forest, IL 60045.

13.     Defendant Robert G. Clarke ("Clarke") has been a member of the Board since 1997. Clarke is a citizen of Vermont and resides at 797 Terrace Drive, Williston VT 05495.

14.     Defendant John M. Goodrich ("Goodrich") has been a member of the Board since 2009. Upon information and belief, Goodrich is a citizen of and resides in Vermont.

15.     Defendant Robert B. Johnston ("Johnston") has been a member of the Board since 2010. Johnston is a citizen of South Carolina and resides at 3305 Hartnett Boulevard, Isle of Palms, SC 29451.

16.     Defendant Elisabeth B. Robert ("Robert") has been a member of the Board since 2009. Robert is a citizen of Vermont and resides at 1664 Greenbush Road, Charlotte, VT 05445.

17.     Defendant Janice L. Scites ("Scites") has been a member of the Board since 1998. Scites is a citizen of New Jersey and resides at 11 N. Stone Hedge Drive 7920, Basking Ridge, NJ 07920.

5

18.     Defendant William J. Stenger ("Stenger") has been a member of the Board since 2006. Stenger is a citizen of Vermont and lives at P.O. Box 112, Newport, VT 05855.

19.     Defendant Douglas J. Wacek ("Wacek") has been a member of the Board since 2006.  Wacek is a citizen of Vermont and resides at 66 Dunder Road, Burlington, VT 05401.

20.     Defendants Sayre, Reilly, Barnett, Clarke, Goodrich, Johnston, Robert, Scites, Stenger, and Wacek are collectively referred to hereinafter as the "Individual Defendants."

21.     Defendant Gaz is a limited partnership existing under the Québec Companies Act and has an address at 1717, rue du Havre, Montreal, Québec H2K 2X3 Canada.   Gaz has over $3.6 billion in assets and is Québec's leading natural gas distributor. Its 10,000 kilometer network serves 300 municipalities.

22.     Defendant Merger Sub is a Vermont corporation with an address at c/o Gaz Métro Limited Partnership, 1717, rue du Havre, Montreal, Québec H2K 2X3 Canada.  Merger Sub is a wholly-owned subsidiary of Gaz (the Individual Defendants and Gaz are collectively referred to herein as "Defendants").

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES UNDER STATE LAW

23.     By reason of the Individual Defendants' positions with the Company as directors, said individuals are in a fiduciary relationship with Plaintiff and the other public shareholders of Central Vermont (the "Class") and owe Plaintiff and the other members of the Class the duties of good faith, fair dealing, loyalty and full and complete disclosure.

24.     By virtue of their positions as directors of Central Vermont, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Central Vermont to engage in the practices complained of herein.

25.     Each of the Individual Defendants is required to act in good faith, in the best interests of the Company's shareholders and with due care.  In a situation where the directors of a publicly traded company undertake a transaction that may result in a change in corporate control, the directors must take all steps reasonably required to maximize the value shareholders will receive rather than use a change of control to benefit themselves, and to disclose all material information concerning the proposed change of control to enable the shareholders to make an informed decision.  To diligently comply with this duty, the directors of a corporation may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     contractually prohibits them from complying with or carrying out their fiduciary duties;

(c)     discourages or inhibits alternative offers to purchase control of the corporation or its assets; or

(d)     will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's shareholders.

26.     In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Central Vermont, are obligated under applicable law to refrain from:

7

(a)     participating in any transaction where the directors' or officers' loyalties are divided;

(b)     participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c)     unjustly enriching themselves at the expense or to the detriment of the public shareholders.

27.     The Individual Defendants are also obliged to honor their duty of disclosure to Central Vermont's shareholders by, *inter alia*, providing all material information to the shareholders regarding a situation in which they are asked to vote or tender their shares in favor of a proposed merger. This duty of disclosure ensures that the Company's shareholders have all information that will enable them to make informed, rational and intelligent decisions as to whether to relinquish their ownership in Central Vermont for the consideration offered.

28.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated duties owed to Plaintiff and the other public shareholders of Central Vermont, including their duties of loyalty, good faith and independence, insofar as they, *inter alia*, engaged in self-dealing and obtained for themselves personal benefits, including personal financial benefits, not shared equally by Plaintiff or the public shareholders of Central Vermont common stock.

## CLASS ACTION ALLEGATIONS

29.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of the Class. The Class specifically excludes

8

Defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

30.     This action is properly maintainable as a class action.

31.     The Class is so numerous that joinder of all members is impracticable.  As of February 28, 2011, Central Vermont had 13,361,029 shares of common stock outstanding.  Members of the Class are scattered throughout the United States and are so numerous that it is impracticable to bring them all before this Court.

32.     Questions of law and fact exist that are common to the Class, including, among others:

(a)     whether the Individual Defendants have breached their fiduciary duties of good faith, loyalty, independence or due care with respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(b)     whether the Individual Defendants have breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(c)     whether the Individual Defendants have breached their fiduciary duty of disclosure to Plaintiff and the other members of the Class in connection with the Proposed Transaction by failing to disclose to shareholders all material information upon which they are able to make an informed decision about whether to vote their shares in favor of the Proposed Transaction;

(d)    whether the Individual Defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other strategic alternatives including offers from interested parties for the Company or its assets;

(e)    whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated; and

(f)    whether Gaz, Merger Sub, and Central Vermont are aiding and abetting the wrongful acts of the Individual Defendants.

33.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

34.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

35.    Preliminary and final injunctive relief on behalf of the Class as a whole is entirely appropriate because Defendants have acted, or refused to act, on grounds generally applicable and causing injury to the Class.

10

## SUBSTANTIVE ALLEGATIONS

### A.        Background

36.        Central Vermont is the largest electric utility in Vermont. The Company engages in the purchase, production, transmission, distribution, and sale of electricity to residential, commercial, and industrial customers. It serves nearly 160,000 customers in 163 cities and towns across Vermont, and employs approximately 520 people. It reported annual revenue of $342 million for the year 2010, and has been listed by Forbes Magazine as one of the most trusted companies in the United States for 60 straight months.

37.        On May 5, 2011, Central Vermont issued a press release announcing consolidated earnings of $8.4 million, or 62 cents per diluted share of common stock, for the first three months of 2011, compared to $4.2 million, or 35 cents per diluted share of common stock, for the same period in 2010. The improved earnings were driven in part by increases in operating revenue and decreases in operating expenses and storm restoration costs compared to the first quarter of 2010. According to Defendant Reilly, "First quarter earnings were significantly improved compared to the same period last year. Our improved performance reflects differences in weather effects, timing of some expenditures, and higher sales volume, which increased due to colder winter weather and the slowly improving economy in the state."

38.        Despite Central Vermont's strong performance and improved earnings over the past year, the Company's Board has now determined to sell the Company at a price below its intrinsic value to the detriment of Central Vermont's common stock holders.

11

**B.** **The Proposed Fortis Transaction**

39.     On May 30, 2011, Central Vermont issued a press release announcing that

it had entered into the Fortis Merger Agreement.  Under the terms of the Proposed Fortis

Transaction, Fortis would acquire Central Vermont by purchasing all of the outstanding

shares of common stock of Central Vermont at a purchase price of $35.10 per share.

40.     Central Vermont's press release stated:

> Fortis Inc. ("Fortis") (TSX - FTS) and Central Vermont Public Service
> ("CVPS") (NYSE - CV) announced today that they have entered into a
> definitive agreement for the acquisition by Fortis of all of the outstanding
> common shares of CVPS for an aggregate purchase price of approximately
> $700 million (U.S.), including the assumption of approximately $230
> million (U.S.) of debt. The all-cash transaction will provide CVPS
> shareholders $35.10 per share, a 44 percent premium over the CVPS
> common share closing price of $24.32 on Friday, May 27.
>
> "CVPS is a well-run utility whose operations and operating philosophy are
> very similar to those of our Canadian regulated utilities," said Stan
> Marshall, President and Chief Executive Officer, Fortis Inc. "The
> commitment of CVPS to customers, as evidenced by the company's stellar
> customer service record, is very much aligned with the operating
> philosophy of Fortis - to provide our customers with safe, reliable service
> in the most cost-efficient and environmentally responsible manner
> possible," he explained.
>
> "At Fortis, we believe that to serve customers well, our operating
> companies need to stay close to our customers," said Marshall. "CVPS
> will remain autonomous in the Fortis model, with its own board of
> directors and its own local management team. CVPS will remain
> headquartered in Rutland with Larry Reilly as President and CEO," he
> said.  "There are no job losses anticipated with this transaction."
>
> The Fortis Group of Companies has regulated utility companies operating
> in five provinces of Canada - British Columbia, Alberta, Ontario, Prince
> Edward   Island   and   Newfoundland   -   and   three   Caribbean
> countries. Marshall explains that there are almost 7,000 employees
> throughout the Fortis Group of Companies; however Fortis' Head Office,
> headquartered in St. John's, Newfoundland, has less than 20
> employees. "We are a very decentralized organization," he said. Reilly
> said Fortis was selected from several bidders following a confidential sales
> process directed by the CVPS Board.

"Fortis and CVPS share a deep commitment to the environment, our workers and the people and places that host our businesses," Reilly said. "While the share offer price by Fortis was a critical consideration by the CVPS Board, the fact that CVPS would essentially be preserved as a stand-alone autonomous company within the Fortis Group was also an important consideration for the CVPS Board.

"Fortis brings financial strength to CVPS, giving us strong access to capital markets not available to smaller utilities," Reilly said. "And we look forward to sharing best practices with the other operating companies of Fortis, with the goal of finding new ways to reduce costs and improve service to our customers."

"This is a great opportunity for CVPS, our customers, employees, the Rutland region and the state as a whole," commented CVPS Chairman Bill Sayre. "A partnership with Fortis brings additional strengths to help us achieve our vision of becoming the best small utility in America."

"We look forward to welcoming the employees of CVPS to the Fortis Group and their continuing strong commitment to meeting our obligation to serve customers," concluded Marshall.

The acquisition is expected to be accretive to earnings per common share of Fortis in the first full year of ownership.

Under the agreement, CVPS customers and employees will receive the following direct benefits:

- Approximately $21 million will be provided by Fortis for the benefit of CVPS customers, in a manner to be determined through the regulatory approval process;
- CVPS will continue to be managed from the company's headquarters and maintain its substantial civic presence in Rutland and across Vermont; and
- CVPS and its customers will benefit from the sharing of best practices among the Fortis Group of Companies in the areas of safety, reliability, efficiency and customer service.

The transaction is subject to the approval of CVPS shareholders, state and U.S. federal regulators and other customary conditions, and is expected to be completed in approximately six to 12 months.

Lazard advised CVPS. Legal advisors to Fortis were White & Case LLC and Kenlan Schwiebert Facey & Goss P.C. CVPS was represented by Loeb & Loeb LLP and Sidley Austin LLP.

13

41.     The consideration offered to Central Vermont's public stockholders in the Proposed Fortis Transaction was unfair and grossly inadequate because, among other things, the intrinsic value of Central Vermont's common stock was materially in excess of the amount offered for those securities in the proposed acquisition given the Company's prospects for future growth and earnings.

42.     Further, as admitted by Defendant Reilly in the May 30, 2011 press release, "While the share offer price by Fortis was a critical consideration by the CVPS Board, the fact that CVPS would essentially be preserved as a stand-alone autonomous company within the Fortis Group was also an important consideration for the CVPS Board." Notwithstanding the Board's duty to maximize shareholder value and obtain the highest possible sale price for Central Vermont, Defendant Reilly admitted that the Individual Defendants, in breach of their fiduciary duties, allowed their preferences, as well as those of the Company's management, regarding how the Company would be managed after a change of control to be an important factor in its decision to enter into the Fortis Merger Agreement with Fortis, as opposed to pursuing deals with alternate bidders.

## C.      **The Proposed Transaction**

43.     Because the Board had agreed to an offer price in the Proposed Fortis Transaction that did not reflect the intrinsic value of Central Vermont shares, Gaz came forward on June 23, 2011, with an unsolicited proposal to acquire all of Central Vermont's outstanding shares for $35.25 – 15 cents more per share than Fortis had offered. Recognizing that Gaz' offer was a "superior proposal", the Company announced on June 27, 2011, that the Board had authorized the Company to engage in discussions

14

with Gaz regarding Gaz' proposal. The discussions that ensued culminated in the
Board's decision to terminate the Fortis Merger Agreement and enter into the Merger
Agreement because the Proposed Transaction with Gaz was superior to the Proposed
Fortis Transaction. Pursuant to the Fortis Merger Agreement, Central Vermont was
required to pay Fortis a $17.5 million termination fee and $2 million in expenses as a
result of terminating the Fortis Merger Agreement.

44.     On July 12, 2011, Gaz and Central Vermont issued a joint press release
that stated in relevant part:

> RUTLAND, VT and MONTRÉAL, QC, July 12, 2011 – The leaders of
> Central Vermont Public Service Corporation (NYSE-CV) (CVPS) and
> Gaz Métro Limited Partnership (Gaz Métro) today announced that a
> definitive agreement for the sale of CVPS has been signed. This clears the
> path for the combination of CVPS and Green Mountain Power
> Corporation (GMP), a subsidiary of Gaz Métro, into one stronger utility
> for Vermonters. The new agreement provides significant benefits for
> customers, community, employees and shareholders, including $144
> million in customer savings over 10 years, a Vermont ownership interest
> in VELCO, and the establishment of the *Headquarters for Operations and
> Energy Innovation* in Rutland.
>
> The all-cash transaction will provide CVPS shareholders $35.25 per
> common share, a 45 percent premium over the closing price of $24.32
> immediately prior to the announcement of the previous agreement CVPS
> had reached with Fortis Inc. (Fortis). The CVPS Board has terminated the
> agreement with Fortis after deeming "superior" the offer from Gaz Métro.
>
> "CVPS and GMP will together become a stronger, more efficient
> enterprise, built on our deeply held mutual commitment to Vermont,"
> GMP President and CEO Mary Powell and CVPS President and CEO
> Larry Reilly said. "We believe that this is not only a tremendous
> opportunity for CVPS and GMP, but for Vermont's economy at this
> critical time. Our combined resources will allow us to continue to provide
> competitively priced power, which is necessary for vibrant communities
> and a growing economy, and strengthen our commitment to low-carbon
> electricity in sync with the environmental ethic of our state."
>
> "The CVPS Board, first and foremost, had a legal responsibility to ensure
> the best possible deal for shareholders, but ***the board also wanted to***

***ensure the best possible outcome for our customers, employees and the communities we serve, Rutland in particular***," said Bill Sayre, chairman of the CVPS Board of Directors. "GMP shared that vision, and our agreement serves all of these constituencies, and ensures CVPS's historic commitment to Rutland will continue."

### One stronger enterprise is good for customers and Vermont's economy

The agreement provides a number of unique benefits for customers. First, the combination of the two companies will deliver $144 million in savings for customers over the next decade – with even greater savings continuing into the future. These savings will be achieved through more efficient distribution of resources, equipment and facilities throughout a more contiguous service territory, regulatory savings and improved purchasing leverage with vendors and service providers. Savings will not be achieved through layoffs – other than some executive officers – but instead through natural retirements and turnover, which will allow for the smooth integration of both companies' workforces.

"When we deliver $144 million in savings for families, businesses and communities that frees up $144 million that can be reinvested to strengthen Vermont," said Mr. Reilly and Ms. Powell. "We have an obligation to the public that we operate in a transparent manner and keep costs as low as possible."

"Also, through the contribution of VELCO stock to a public trust, this deal presents a dual benefit by helping our neighbors in need, as well as giving Vermonters an important ownership stake in the operation of the state's most important transmission asset," noted Mr. Reilly and Ms. Powell. The establishment of a public trust with $1 million in annual income to support a low-income rate program is made possible by an annual dividend generated through a contribution of VELCO stock, as well as an annual charitable contribution from the combined entity. The contribution of VELCO stock to the public trust means that the new combined entity will hold less than 50 percent of VELCO voting stock, and control of VELCO will remain with Vermont entities.

Finally, there are a number of important ways that the combination of CVPS and GMP will improve reliability and service for Vermonters. A contiguous service territory and one Operation Headquarters will streamline storm response to restore power faster and reduce the overall frequency and duration of outages. Also, with the benefit of the combined utility's information technology resources, it will be able to move basic services online more swiftly, and allow customer service representatives to provide more personalized service, which will be especially important for the implementation of the statewide Smart Grid initiative.

**New benefits for Rutland**

The companies agreed that CVPS's historic commitment to its hometown of Rutland will remain part of the new utility's corporate culture. To ensure that commitment, the merged company will locate its *Headquarters for Operations and Energy Innovation* in Rutland, and pledge to build on CVPS's extensive community support efforts.

"When the communities we serve succeed, we succeed," said Ms. Powell. "In talking with local leaders in recent weeks, I can't help but be excited about all that is happening in Rutland. Making sure that the Rutland region maintains a strong utility presence is important – but it is as important for us to be a catalyst for job growth. With the right mix of public and private sector support, I know that Rutland will be a strong economic engine in our state."

The *Headquarters for Operations and Energy Innovation* will be the combined company's command post for utility operations. On the energy innovation side, the headquarters will include staff focused on creative generation solutions, such as distributed generation and renewable energy projects. The nature of the work will mean enhancing appropriate staff at the Rutland headquarters.

In addition to locating the Operations Headquarters in Rutland, the combined company will:

- Commit to no layoffs other than some executive officer positions due to the consolidation, nor the mandatory relocation of Rutland employees. Under the combined company's plan for customer savings, natural retirements and turnovers will be proportional between CVPS and GMP;
- Work with local leaders to find space in the downtown for a new facility – with a strong preference towards rehabilitating vacant downtown space – and work on a plan to repurpose existing CVPS facilities;
- Create a $100,000 *"Open for Business"* fund, to be administered by Rutland's Downtown Partnership, to help continue the revitalization of downtown Rutland by subsidizing rent for several new businesses for up to two years. CVPS will provide half the funds immediately, with GMP

17

providing the second half at closing;

- Create a $100,000 *"Green Growth"* fund, to be administered by the Rutland Economic Development Corporation (REDC), to support specific initiatives to advance green sector jobs and technologies. CVPS will provide half the funds immediately, with GMP providing the second half at closing;

- Kick-start a significant new "Solar City" program in Rutland. Building on CVPS's renewable energy success with CVPS Cow Power™ and other programs, GMP will bring its expertise in solar power to develop ideas such as a commercial-size solar orchard, small-scale backyard and rooftop solar, and deployment of other renewable energy technology. In the coming weeks, a committee of Rutland region leaders and interested residents will be announced to help develop these ideas and recommend a direction for the effort.

"GMP has clearly listened to and addressed concerns Rutland leaders and residents have voiced since their offer was made public," Rutland Mayor Christopher Louras said. "Ultimately I would have preferred that CVPS remain an independent company headquartered here, but through the agreement, significant, meaningful commitments to Rutland are made, especially related to local jobs, and therefore, I endorse the merger. Making Rutland the *Headquarters for Operations and Energy Innovation* is important to the region, and the commitments to downtown, REDC, solar development and ongoing community support have convinced me that the new merged company will be a leading corporate citizen just as CVPS has been. GMP's commitment to a plan that any positions unfilled through natural turnover and retirement will be proportional, that CVPS will not face disproportional losses, and that relocations will not be used to reduce local jobs, was also critical to me and the City of Rutland."

"We are committed to Rutland and the unique and meaningful community programs CVPS has developed here, including Shareheat, the Gift-of-Life Marathon, osprey conservation and the company's corporate giving program," Ms. Powell said.

"We are also mindful that this new statewide utility will be serving more than 250,000 customers located across Vermont: from St. Albans to

Bennington, Brattleboro to St. Johnsbury, and west across Route 2 through the capital district back to Chittenden County – and most of the towns in between," Ms. Powell noted. "These communities are important economic drivers for Vermont, so our services and focus must be statewide."

**Maximize employee knowledge and experience**
"Both CVPS and GMP are blessed with great employees, and it will be a privilege to meet and work alongside the CVPS staff," said Ms. Powell. "As we write the next chapter in the story of these great companies, we must harness the experience and know-how of all employees to be the best-of-the-best for our customers."

To achieve the maximum benefits of a combination of GMP and CVPS, a transition committee, to be co-chaired by Ms. Powell and Mr. Reilly, will be created. The committee will look at the operations and business processes of each company in detail, identify best practices and craft a plan to provide customers of the combined company with the best service possible. Through this process, a combined organizational structure will be developed, which will be staffed by the strongest team of executives and professional staff available – regardless of which legacy company they came from. This substantial effort will begin soon, but will take months to complete.

"This combination is a unique opportunity that will allow employees at both companies to provide quality service to our customers well into the future, while maintaining the important local bonds that set Vermont utilities apart," added Mr. Reilly and Ms. Powell. "That's why the CVPS and GMP teams are committed to working closely together during this transition to ensure that our customers benefit directly from this combination. We want to be sure that when the merger is complete we deliver tremendous value for our customers, exciting opportunities for our employees, and the same deep commitment to our communities and Vermont."

**Shareholder benefits**
In addition to customer and community benefits, CVPS shareholders will also benefit as a result of the agreement between CVPS and Gaz Métro. Not only is the purchase price of $35.25 per common share, a 45 percent premium over the pre-Memorial Day closing price of $24.32, CVPS shareholders will retain the right to receive CVPS's regular quarterly dividend of $0.23 per share until closing.

"Gaz Métro is excited to expand its operations in Vermont through the combination of CVPS and GMP," said Gaz Métro President and CEO Sophie Brochu. "We believe that the combination of CVPS and GMP will

prove deeply beneficial to our customers. Both companies share a vigorous commitment to community and customer service that is consistent with our corporate approach."

"Our philosophy is to rely on experienced local management and provide them the capital they need to grow and thrive," added Ms. Brochu. "Mary Powell will be the president and CEO of the combined company, and she will assemble a strong local leadership team to guide the company forward."

The sale is subject to approval of CVPS common shareholders, and U.S. federal and state regulators, and is expected to be completed in approximately six to 12 months. Following the completion of the transaction, CVPS and GMP's combined operations will join Vermont Gas Systems and Portland Natural Gas Transmission Systems under Gaz Métro's wholly owned Vermont-based subsidiary, Northern New England Energy Corporation.

BMO Capital Markets acted as Gaz Métro's financial advisor. Legal counsel to Gaz Métro was provided by Osler, Hoskin & Harcourt LLP. Lazard Ltd. advised CVPS. Legal counsel to CVPS was provided by Sidley Austin LLP, Loeb & Loeb LLP, and Downs Rachlin Martin PLLC.

45.     The consideration offered to Central Vermont's public stockholders in the

Proposed Transaction is unfair and grossly inadequate because, among other things, the

intrinsic value of Central Vermont's common stock is materially in excess of the amount

offered for those securities in the proposed acquisition given the Company's prospects for

future growth and earnings.  Indeed, as admitted by Defendant Sayre in the July 12 press

release, the Board did not unequivocally pursue its clear legal mandate to ensure the best

possible deal for shareholders – it did not, for instance, shop the Company with alternate

bidders – but instead sought also to serve other interests such as the Rutland community

when negotiating with Gaz.

**D.      The Preclusive Deal Protection Devices**

46.      Because the Board did not engage in an adequate sales process before agreeing to the terms of the Proposed Fortis Transaction, Fortis' offer price was materially below the intrinsic value of Central Vermont shares.  Consequently, Gaz came forward with a proposal that was superior to the Proposed Fortis Transaction, but because the Board had agreed to certain onerous and preclusive deal protection devices in the Fortis Merger Agreement, the Company was forced to pay Fortis $19.5 million in order to terminate the Fortis Merger Agreement and accept Gaz' proposal.

47.      However, while the Proposed Transaction is superior to the Proposed Fortis Transaction, the price offered for Central Vermont shares in the Proposed Transaction is still materially below their intrinsic value given the Company's prospects for future growth and earnings.  Indeed, the Board again failed to undertake an adequate sales process to obtain a fair offer price for Central Vermont shares.  Instead, the Board again agreed to the same preclusive deal protection devices in the Merger Agreement that it had agreed to in the Fortis Merger Agreement.  Consequently, to the detriment of Central Vermont's shareholders, the Individual Defendants agreed in the Merger Agreement to certain onerous and preclusive devices that will either serve to prevent another bidder from coming forward with a superior offer or will again require the Company pay a substantial amount of cash that could have gone to shareholders simply to accept any proposal that is superior to the Proposed Transaction, even if that proposal is itself inadequate.

48.      On July 12, 2011, the Company filed a Form 8-K with the SEC wherein it disclosed the terms of the Merger Agreement.  Section 5.4 of the Merger Agreement is a

restrictive no-shop provision that prohibits the members of the Board from taking any affirmative action to comply with their fiduciary duties to maximize shareholder value, including soliciting proposals relating to alternative tender offers or business combinations.

49.     The Merger Agreement also includes a strict "standstill" provision which prohibits, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to proposals regarding alternative tender offers or business combinations.

50.     Section 5.4(b) of the Merger Agreement provides a limited situation in which the Central Vermont Board may enter into discussions and negotiations in response to an unsolicited competing bid: after receiving a written Acquisition Proposal and the Board "determines in good faith, after consultation with its financial advisors and outside counsel, that such Acquisition Proposal constitutes or is reasonably likely to lead to a Superior Proposal."

51.     Even then, however, section 5.4(c) of the Merger Agreement requires the Central Vermont Board to provide Gaz with written notice of any Acquisition Proposal within twenty-four hours of its receipt.   Further, per section 5.4(f) of the Merger Agreement, "if the Company receives an Acquisition Proposal which the Company Board determines in good faith, after consultation with its financial advisors and outside counsel, constitutes a Superior Proposal," the Board must provide written notice to Gaz of the Superior Proposal and negotiate with Gaz for at least five business days following Gaz 'receipt of the notice, so that Gaz has the opportunity to adjust the terms and

22

conditions of the Merger Agreement so that the Acquisition Proposal ceases to be a Superior Proposal.

52.     Thus, even if the Central Vermont Board receives a competing bid that appeared to be "superior" to Gaz' offer, they are precluded from entering into discussions and negotiations unless they first reasonably determine in good faith that the alternative proposal is, in fact, "superior" or could reasonably be expected to lead to a "Superior Proposal."   Consequently, this provision prevents the Central Vermont Board from exercising their fiduciary duties and precludes an investigation into competing proposals unless, as a prerequisite, the majority of the Central Vermont Board first determines that the proposal is "superior" " or reasonably could be expected to lead to a "Superior Proposal."

53.     In addition, the Merger Agreement provides that Central Vermont must pay to Gaz a termination fee of $17.5 million and reimburse Gaz for up to $2 million representing nearly 2.8% of the approximate deal value of $700 million, if the Company decides to pursue another offer, thereby essentially requiring that the alternate bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.   A termination fee in the amount of 2.8% is unreasonably high for this type of transaction.

54.     Ultimately, these preclusive deal protection devices illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited alternative acquisition proposal that constitutes, or would reasonably be expected to constitute, a superior proposal are too

narrowly circumscribed to provide an effective "fiduciary out" under the circumstances. Likewise, these provisions will foreclose the new bidder from providing the needed market check of Gaz' inadequate offer.

55.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

## FIRST CAUSE OF ACTION

### Claim for Breach of Fiduciary Duties Against the Individual Defendants

56.     Plaintiff repeats and realleges each allegation set forth herein.

57.     The Individual Defendants have violated fiduciary duties of care, loyalty, disclosure and good faith owed to public shareholders of Central Vermont.

58.     By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in Central Vermont.

59.     As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, disclosure and independence owed to the shareholders of Central Vermont because, among other reasons, they failed to take steps to maximize the value of Central Vermont to its public shareholders, and they have failed to fully disclose to Plaintiff and the Class all material information necessary to make an informed decision regarding the Proposed Transaction.

60.     The Individual Defendants dominate and control the business and corporate affairs of Central Vermont, and are in possession of private corporate

information concerning Central Vermont's assets, business and future prospects. Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Central Vermont which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing shareholder value.

61.     By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

62.     As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Central Vermont's assets and businesses and have been and will be prevented from obtaining a fair price for their common stock.

63.     Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the members of the Class.

64.     Plaintiff and the members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which the Individual Defendants' actions threaten to inflict.

## SECOND CAUSE OF ACTION

### On Behalf of Plaintiff and the Class
### Against Central Vermont, Gaz, and Merger Sub for Aiding and Abetting the Individual Defendants' Breach of Fiduciary Duty

65.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

25

66.     Central Vermont, Gaz, and Merger Sub have acted and are acting with knowledge of the fact that the Individual Defendants are in breach of their fiduciary duties to Central Vermont's public shareholders, and have participated in such breaches of fiduciary duties.

67.     Central Vermont, Gaz, and Merger Sub knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein. In so doing, Central Vermont, Gaz, and Merger Sub rendered substantial assistance in order to effectuate the Individual Defendants' plan to consummate the Proposed Transaction in breach of their fiduciary duties.

68.     Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief in her favor and in favor of the Class and against Defendants as follows:

A.      Declaring that this action is properly maintainable as a Class action and certifying Plaintiff as Class representatives;

B.      Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain transaction providing the best possible terms for shareholders;

C.      Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D.      Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the Individual Defendants' wrongdoing;

E.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.     Granting such other and further equitable relief as this Court may deem just and proper.

Dated: July 13, 2011

/s/ A. Jeffry Taylor
A. Jeffry Taylor
Abatiell Associates, P.C.
One Justice Square
Rutland, VT 05701
Tel: (802) 775-2508
Fax: (802) 775-2500

*Counsel for Plaintiff*

**OF COUNSEL:**
**FARUQI & FARUQI, LLP**
Juan E. Monteverde, Esquire
369 Lexington Avenue, 10th Fl.
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331