UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | |
|---|---|
| HOWARD DAVIS, On Behalf of Himself and All Others Similarly Situated )<br><br>Plaintiff, )<br><br>v. )<br><br>CENTRAL VERMONT PUBLIC SERVICE CORPORATION, WILLIAM R. SAYRE, LAWRENCE J. REILLY, ROBERT L. BARNETT, ROBERT G. CLARKE, JOHN M. GOODRICH, ROBERT B. JOHNSTON, ELISABETH B. ROBERT, JANICE L. SCITES, WILLIAM J. STENGER, DOUGLAS J. WACEK, GAZ MÉTRO LIMITED PARTNERSHIP, and DANAUS VERMONT CORP. )<br><br>Defendants. ) | Case No. 5:11-cv-181 |

## THE CVPS DEFENDANTS' MOTION TO DISMISS[1]

The CVPS Defendants respectfully request that this Court dismiss Plaintiff Howard Davis'

Amended Complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).  As set

forth below in more detail in the accompanying memorandum of law, Plaintiff's hastily-filed claims

consist of little more than conclusory allegations based on CVPS's own public announcements and

securities filings.  As such, they do not satisfy the applicable pleading standards and are legally

insufficient, and the Complaint should therefore be dismissed in its entirety.

## MEMORANDUM IN SUPPORT OF THE CVPS DEFENDANTS' MOTION TO DISMISS

On July 12, 2011, Central Vermont Public Service Corporation and Gaz Métro Limited

Partnership ("Gaz Métro"), announced that they had entered into a merger agreement (the "Gaz

---

[1] The CVPS Defendants include Central Vermont Service Corporation ("CVPS" or the "Company") and William R. Sayre, Lawrence J. Reilly, Robert L. Barnett, Robert G. Clarke, John M. Goodrich, Robert B. Johnston, Elisabeth B. Robert, Janice L. Scites, William J. Stenger, and Douglas J. Wacek (collectively, the "Directors" or the "Board").

Métro Merger") whereby, subject to shareholder and regulatory approval, Gaz Métro would acquire CVPS for a price of $35.25 per share.  (Compl. ¶ 47.)  The total purchase price of the transaction is approximately $700 million.  (*Id.*)  The day after the Gaz Métro Merger was announced, plaintiff Howard Davis ("Plaintiff") filed his initial complaint in this case.  Among other things, the initial complaint included claims of inadequate disclosures despite the fact that CVPS had not yet prepared, much less disseminated to shareholders, its proxy statement regarding the Gaz Métro Merger.  (Initial Compl. ¶¶ 5, 57, 59) (Doc. No. 1.)  On August 1, 2011, CVPS lodged its preliminary proxy statement with the Securities and Exchange Commission ("SEC") for review.  Not content to await the finalized Proxy (i.e., the version actually disseminated to shareholders) ("Proxy" or "Proxy Statement") (copy attached as Ex. A),[2] Plaintiff filed an Amended Complaint ("Complaint" or "Compl.") the very next day, asserting individual federal claims for alleged violations of Section 14(a) (Count III) and Section 20(a) (Count IV) of the Securities and Exchange Act of 1934 ("the Exchange Act") and state law class claims for breach of fiduciary duty and aiding and abetting (Counts I and II, respectively).  These hastily-filed claims consist of little more than conclusory allegations based on CVPS's own public announcements and securities filings.  They do not satisfy the applicable pleading standards and are legally insufficient, and the Complaint should therefore be dismissed in its entirety.

    As an initial matter, Plaintiff's claims that CVPS's Proxy violates Sections 14(a) and the SEC rule promulgated thereunder are fatally flawed.  The Complaint cites SEC Rule 14a-9, which prohibits the inclusion of false or misleading statements in a proxy.  (Compl. ¶ 92 (quoting Rule 14a-9, 17 C.F.R. § 240.14a-9, for the proposition that proxy statements shall not contain "any

---

[2] CVPS's finalized Proxy was filed with the SEC and disseminated to shareholders on August 29, 2011. (*See* Proxy, Ex. A, *available at* http://www.sec.gov/Archives/edgar/data/18808/000121465911002911/s817110defm14a.htm.) While its contents were largely the same as the preliminary proxy, it contained some changes.

statement which, at the time an[sic] in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading.").)  However, the Complaint does not identify even a single false statement in the Proxy.  Nor does it identify with particularity any statement that has been rendered "misleading," much less indicate *why* or *how* such statement is misleading, in the absence of additional detail the Complaint claims to seek.  These deficiencies are fatal, especially given the heightened pleading requirements of the Private Litigation Securities Reform Act ("PLSRA").

Instead, the Complaint purports to identify additional pieces of information that it claims would be "relevant" or of particular interest to investors.  (Compl. ¶ 74.)  But as numerous courts have recognized, this does not suffice to state a claim under Rule 14a-9 or Section 14(a).  Rule 14a-9 does not prescribe any affirmative disclosure requirements but simply contains prohibitions on false or misleading statements in a proxy.  And, tellingly, the Complaint does not allege that the Proxy fails to comply with any of the affirmative disclosure requirements for proxies established by the SEC, *i.e.*, in Schedule 14A.

Plaintiff's state law claims for breach of fiduciary duty fare no better.  Vermont has adopted a statutory standard regarding the duties of directors, which requires that directors discharge their duties "in good faith,"  "in a manner the director believes to be in the best interests of the corporation,"  and "with the care an ordinarily prudent person in a like position would exercise under similar circumstances."  11A V.S.A. § 8.30(a).  Here, the Complaint's assertions of bad faith and conflicts of interest are nothing more than conclusory allegations of a sort repeatedly rejected at the pleading stage by other courts.  Indeed, nine of the ten members of the CVPS Board of Directors are independent directors whose interests are not alleged to differ in any legally material respect from those of all CVPS shareholders.  And to the extent that Plaintiff addresses the "care" element

3

of the statute, he makes no attempt at all to allege that the Board did not engage in a careful, diligent and attentive process in making the decisions challenged here.  Rather, Plaintiff's allegations are nothing more than an impermissible exercise in second-guessing the business judgment decisions of the CVPS Board.  This too does not suffice to state a claim.

## BACKGROUND

I.    BACKGROUND OF THE PROCESS LEADING TO A MERGER TRANSACTION.

As the Complaint itself indicates, with repeated reference to the Proxy, the Gaz Métro merger agreement is the result of a prolonged and intensive process that occurred over many months.[3]  This process began after CVPS received two unsolicited indications of interest (one being from Gaz Métro, at $25 per share), with respect to a potential transaction.  (Proxy, Ex. A, at 24.)  In order to more broadly explore the possibilities for a transaction, in February 2011, Lazard Frères & Co., LLC  ("Lazard"), which had been selected to act as the Company's financial advisor, contacted 16 parties selected by the Board in consultation with Lazard and management.  (*Id.* at 25; Compl. ¶71(b).)  Eight of these sixteen parties entered into confidentiality agreements with CVPS, and four of the interested parties eventually elected to submit initial written indications of interest, which ranged from $25.00 per share to $28.70 per share.  (Proxy, Ex. A, at 26.)  Additional "due diligence" information was then made available to the top three of these parties (Gaz Métro, Fortis and Company B).  (*Id.*)  A bidding process ensued, as disclosed in the Proxy in sections to which the Complaint makes express reference.  (Compl. ¶¶ 49-50.)  On April 18, 2011, Lazard sent letters

---

[3] The facts herein are taken from Plaintiff's allegations, SEC filings, and documents referred to and relied upon in the Complaint, including the proxy statements filed by CVPS, all of which the Court may consider on a motion to dismiss.  *See Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005) ("In determining the adequacy of the complaint, the court may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint." ); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (in considering a motion to dismiss, a court may rely on public disclosure documents filed with the SEC such as a proxy statement).

to Gaz Métro, Fortis and Company B indicating that each company should submit firm offers by May 16, 2011.  (Proxy, Ex. A, at 26.)  After reviewing the offers with its advisors on May 21, the Board elected not to proceed with any of them, given concerns about each, but instead directed that improvements be sought and that the bidders each be told that they should inform Lazard of their "best and final offers" prior to a May 25, 2011 Board meeting  (*Id.* at 27.)  Of the three offers that were submitted on May 16, Gaz Métro's had been the highest ($34.00 per share), but the Gaz Métro mark-up of a draft merger agreement which the Company had provided to all the bidders "weakened the steps required by Gaz Métro to obtain regulatory approval *and allowed Gaz Métro to terminate the agreement without penalty if conditions imposed in regulatory approvals had a material adverse effect on Gaz Métro's (unspecified) expected benefits from the transaction*."  (*Id.* at 27) (emphasis supplied).

On May 24, 2011, the bidders were provided with a form of a no-shop agreement that they were told the Company was prepared to enter into with the party to be selected by the Board at its May 25, 2011 meeting.[4]  (Proxy, Ex. A, at 28.)  Later that day, Fortis submitted a revised offer of $34.10 per share.  By contrast, Gaz Métro expressly declined to modify any aspect of its offer, retaining not only its prior $34.00 price but the revised merger agreement provisions pertaining to regulatory approval conditions that it had been told were problematic.  (*Id.*)  Accordingly, given that, as explained in the Proxy, "all of these factors favored a transaction with Fortis" – i.e., the Fortis offer was at least as high as the Gaz Métro offer, had none of  the regulatory issues associated with Gaz Métro's revisions to the draft merger agreement, and had other perceived advantages  as well to employees and the local economy – at its meeting on the morning of May 25, 2011, the Board selected the Fortis proposal as the winner and, as had been promised beforehand to all the

---

[4] On May 24, 2011, Company B informed Lazard that its best and final was $32.50.  (*Id.* at 28.)

bidders, entered into a no-shop agreement with Fortis in order to finalize a transaction.[5]  (Compl. ¶ 50 (discussing disclosures in preliminary proxy statement); Proxy, Ex. A, at 28 (disclosing facts referred to in Compl. ¶ 50).)  Gaz Métro was subsequently informed that its proposal had not been selected.

In the evening of May 25, 2011, Gaz Métro nonetheless sent an e-mail to Lazard indicating that it was increasing its offer to $35.00 per share (but not modifying other aspects of the prior offer).  (Proxy, Ex A, at 29 (disclosing facts discussed in Compl. ¶ 50).)  Upon being informed of this fact, Fortis raised its offer to $35.10 per share on May 27, 2011.  (*Id.*)  Thereafter, at the May 27, 2011 Board meeting, the Board unanimously approved a merger agreement with Fortis (the "Fortis Agreement"), the details of which had been finalized in the interim.  (*Id.*)  On May 30, 2011, CVPS issued a press release announcing the execution of the Fortis Agreement, and noting that the $35.10 price constituted a 44% premium over the closing CVPS stock price the day before the announcement ($24.32 per share).  (Compl. ¶ 43.)

On June 23, 2011, CVPS received an unsolicited proposal from Gaz Métro, offering, among other things, to acquire CVPS for $35.25 per share.  (*Id.* ¶ 46.)  In addition, the Gaz Métro proposal also newly offered to provide CVPS customers with $144 million in savings over ten years.  (Proxy, Ex. A, at 30.)  And Gaz Métro submitted a new proposed merger agreement modeled on the Fortis Agreement.  The Board determined that this new Gaz Métro offer was reasonably likely to lead to a "superior proposal" and commenced negotiations with Gaz Métro (as permitted by the no-shop agreement in the event of such a circumstance).  (Compl. ¶ 46.)  Ultimately, after additional negotiations, including resolution of all issues regarding the form of a merger agreement, the Board

---

[5] The no-shop agreement provided that, through June 1, 2011, CVPS would cease conversations with other bidders and not solicit any other offers.  However, the no-shop agreement permitted CVPS to accept an offer from, or participate in discussions or negotiations with, any party who made an offer if the Board of Directors determined that the failure to do so would be inconsistent with its fiduciary duties.  (*Id.*)

6

eventually concluded that the new Gaz Métro offer was superior and decided to terminate the Fortis Agreement and enter into a merger agreement with Gaz Métro (the "Gaz Métro Agreement").  (*Id.*) Like the Fortis Agreement, the Gaz Métro Agreement does *not* include a provision of the sort previously proposed by Gaz Métro, i.e., one allowing it "to terminate the agreement without penalty" if conditions imposed in regulatory approvals had a material adverse effect on Gaz Métro's expected benefits from the transaction.  (*See generally* Gaz Métro Agreement, *available at* http://www.sec.gov/Archives/edgar/data/18808/000114036111036497/ex2_1.htm) (Ex. B.)  On July 12, 2011, CVPS and Gaz Métro issued a joint press release publicly announcing the execution of the Gaz Métro Agreement and termination of the Fortis Agreement.  (Compl. ¶ 47.)

II.     LITIGATION PROCEEDINGS

The day following the announcement of the Gaz Métro Agreement, on July 13, 2011, Plaintiff filed his initial complaint in this action alleging that the Board of Directors breached its fiduciary duties in connection with  the proposed sale of CVPS.  On August 2, 2011, the day after CVPS filed its preliminary proxy statement with the SEC, Plaintiff filed an Amended Complaint to include claims under Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934.  (Compl. ¶¶ 89-103.)  The Complaint admits that, with the exception of allegations pertaining to Plaintiff himself, its allegations are based exclusively "on information and belief."  (Compl. at 1.)

**ARGUMENT**

I.     PLAINTIFF HAS FAILED TO STATE A CLAIM FOR VIOLATION OF SECTION 14(a).

A proxy is not required to contain all information that a shareholder may be interested in knowing.  Regulation 14A, 17 C.F.R. § 240.14a-1, *et seq.* (setting forth the specific categories of information that must be contained in a proxy statement); *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002) ("Disclosure of an item of information is not required [ ] simply because it may be relevant or of interest to a reasonable investor.")  Instead, under the federal securities laws, there are

7

two sets of requirements governing the information in proxy statements: (1) Schedule 14A sets forth the affirmative requirements as to what must be included in a proxy statement, 17 C.F.R. § 240.14a-1 *et seq.*; and (2) SEC Rule 14a-9 provides that a proxy cannot contain false or misleading statements, including statements rendered false or misleading due to the omission of information necessary to prevent them from being so.  17 C.F.R. § 240.14a-9.

The Complaint does not allege any violation of the affirmative disclosure requirements set forth in Schedule 14A, much less specify any such requirement with which the CVPS Proxy allegedly failed to comply.  Rather, Plaintiff's Section 14(a) claims are based on an alleged violation of Rule 14a-9.  (Compl. ¶¶ 92-93.)  However, Plaintiff utterly fails to satisfy the requirements for pleading any such violation.  In particular, Plaintiff fails to identify with particularity any statement supposedly rendered false or misleading by the purported "omissions" set forth in the Complaint.  (*See id.* ¶¶ 71-73.)  This deficiency is fatal given the requirements of the PSLRA.

Under the PSLRA, a plaintiff "[i]n any private action arising under this title" which alleges untrue statements or misleading omissions must "specify each statement alleged to have been misleading" *and* "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). In addition, where, as here, allegations are based on information and belief (Compl. at 1), the PSLRA requires a complaint to allege the facts upon which any such belief is based.  15 U.S.C. § 78u-4(b)(1).  "Mere speculation is insufficient to satisfy the PSLRA pleading standard."  *See Bond Opportunity Fund v. Unilab Corp.*, 87 Fed. Appx. 772, 773 (2d Cir. 2004).  These requirements apply to claims under Section 14(a).  *Id.*; *Fisher v. Kanas*, 467 F. Supp. 2d 275, 281 (E.D.N.Y. 2006).[6]  Thus, when, as here, a complaint fails to identify specific statements in a proxy that are

---

[6] Courts in other circuits have also recognized that the PSLRA applies to claims brought under Section 14(a).  *See Beck v. Dobrowski*, 559 F.3d 680, 681-82 (7th Cir. 2009); *Knollenberg v. Harmonic, Inc.*, 152 Fed. Appx. 674, 682-83 (9th Cir. 2005); *Hayes v. Crown Cent. Petroleum*

alleged to be rendered false or misleading by virtue of alleged omissions, *or* fails to explain with particularity in what way any specific statement is "false or misleading" in the absence of additional information, its Section 14(a) claim should be dismissed. *In re Marsh & McLennan Co., Inc. Sec. Litig.*, 536 F. Supp. 2d 313, 323 (S.D.N.Y. 2007) (dismissing complaint where plaintiff failed to "identify any particular statements . . . that are made false or misleading by the indentified omissions"); *see also Resnik*, 303 F.3d at 154 (affirming dismissal of complaint where omitted information was "not required to make other information presented in the proxy statement not materially false or misleading").[7]

Plaintiff has not satisfied the PSLRA's requirements.  While the Complaint lists a variety of allegedly omitted information, it does not identify *any* statements allegedly rendered false or misleading by virtue of the allegedly omitted information.  Nor does the Complaint attempt to explain in what way any Proxy statements were rendered false or misleading by these alleged omissions.  Instead, the Complaint contains nothing more than conclusory assertions that the Proxy is "materially misleading" in ways that are never specified or explained.  (*See, e.g.*, Compl. ¶¶ 68, 93.)  These conclusory allegations are insufficient as a matter of law.  *See, e.g.*, *Dixon*, 2011 WL 1219256, *2 (dismissing claim under Section 14(a) for failure to comply with requirements of the PSLRA where plaintiff failed to "allege any facts regarding what other statements became misleading or false as a result"); *Beck v. Dobrowski*, 2007 WL 3407132, at *6 (N.D. Ill. Nov. 14, 2007) (dismissing Section 14(a) claim that "simply list[ed] information that Defendants allegedly

---

*Corp.*, 78 Fed. Appx. 857 (4th Cir. 2003); *Dixon v. Ladish Co., Inc.*, 2011 WL 1219256, at *2 (E.D. Wis. Mar. 30, 2011); *Little Gem Life Sciences LLC v. Orphan Med., Inc.*, 2007 WL 541677, at *3 (D. Minn. Feb. 16, 2007).

[7] *See also Seinfeld v. Becherer*, 461 F.3d 365, 369 (3d Cir. 2006) ("The omission of information from a proxy statement will violate [§ 14(a) and Rule 14a-9] if . . . the omission makes other statements in the proxy statement materially false or misleading.") (citation omitted); *Seinfeld v. Bartz*, 322 F.3d 693, 696 (9th Cir. 2003) ("Rule 14a-9 prohibits the solicitation of a proxy by means of a proxy statement that . . . omits to state any material fact necessary in order to make the statements therein not false or misleading.") (citation omitted).

omitted from the proxies" but failed to identify what statements were rendered misleading by alleged omissions and how such omissions rendered such statements false or misleading), *aff'd* 559 F.3d 680 (7th Cir. 2009).

Nor is Plaintiff's Section 14(a) claim salvaged by the Complaint's assertions that additional information would (purportedly) help shareholders "to make a fully informed decision" (*id.* ¶ 5) and "evaluate and properly assess the credibility" of various analyses (*id.* ¶ 72), or is "highly relevant and material." (*Id.* ¶ 74.)  There is a wide gulf between additional information claimed to be helpful or potentially relevant and information whose omission causes a statement to be misleading.  It is only the latter that Rule 14a-9 requires be supplied.  Thus, as courts in this Circuit and elsewhere have repeatedly held, a Section 14(a) claim that is merely based on the alleged relevance or materiality of additional information does not state a claim at all.  *See Resnik*, 303 F.3d at 154 ("Disclosure of an item of information is not required [ ] simply because it may be relevant or of interest to a reasonable investor."); *In re Marsh & McLennan Co., Inc. Sec. Litig.*, 536 F. Supp. 2d at 324 (no duty to disclose information even though it was "arguably relevant"); *Lane v. Page*, 581 F. Supp. 2d 1094, 1125 (D.N.M. 2008) (stating that every piece of relevant information need not be disclosed); *In re Nokia Corp. Sec. Litig.*, 1998 WL 898334, at *5 (S.D.N.Y. Dec. 22, 1998) ("A corporation has no duty to disclose every piece of information in its possession . . . whenever it speaks.") (citation omitted).

All of the additional information that the Complaint alleges the Proxy fails to disclose falls into this legally insufficient category, because none of it is tied with particularity to statements allegedly rendered false or misleading thereby.  For example, the Complaint asserts a failure to disclose how many of the parties contacted by Lazard, or which themselves initiated inquiries, "were strategic buyers, and what numbers were financial buyers."  (Compl. ¶¶ 71(b), 71(g).)  But nowhere does the Complaint identify a statement claimed to be misleading in the absence of this

10

level of detail, much less explain how it is misleading absent these details.  Instead, the Complaint simply requests "more" information, a demand that can always be made with respect to any proxy statement, and which threatens to "bury the shareholders in an avalanche of trivial information." *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448-49 (1976); *Seinfeld v. Becherer*, 461 F.3d 365, 370 (3d Cir. 2006).  Similarly, the Complaint's claim that the Proxy is somehow unlawful unless it recites in detail the specific "content" of each of several dinner meetings (*see, e.g.*, Compl. ¶¶ 71(d), (e), (f) and (i)) improperly treats a proxy as if it were a Q&A session, or an interrogatory response.  It is not.  The existence of additional conceivable questions that a shareholder could ask related to the sales process does not state a claim for violation of Section 14(a).  *See Resnik*, 303 F.3d at 154.

Similarly deficient is Plaintiff's recitation of additional information which he conclusorily asserts the Proxy "should provide" to assist shareholders "to evaluate and properly assess the credibility of the various analyses performed by Lazard." (Compl. ¶ 72.)  Again, the Complaint is devoid of particularized allegations connecting any of the alleged omissions relating to Lazard's work to any statement in the Proxy that was allegedly rendered false or misleading by the omission. Instead, the purported "omissions" largely consist of requests for additional information about Lazard's "rationale" for why it did what it did in its analyses.[8]  But nothing in Section 14(a) or Rule 14(a)(9) requires this level of detail, or requires a company to anticipate and answer the additional "why" inquiries that a creative claimant will always be able to fashion.  Plaintiff's 14(a) claims are based on a fundamentally erroneous legal theory and should be dismissed.[9]

---

[8] Not only is CVPS under no obligation under the federal securities laws to provide such additional information, as discussed below (see pp. 29-30, *infra*) much of what Plaintiff complains was not disclosed actually was disclosed.

[9] Alleging a primary violation under Section 14(a) is a necessary predicate to a finding of secondary liability under Section 20(a).  *Rombach v. Chang*, 355 F.3d 164, 177-78 (2d Cir. 2004) (secondary claims under Section 20(a) must be dismissed if primary claims are dismissed); *Leykin v. AT&T*

II.     PLAINTIFF'S STATE LAW CLAIMS FOR BREACH OF FIDUCIARY DUTY ALSO
        FAIL AS A MATTER OF LAW.

Plaintiff's claims that the Directors breached their fiduciary duties under state law in

connection with both the Gaz Métro Merger and Fortis Agreement must also be dismissed.  A

complaint is subject to dismissal if it fails to state a claim upon which relief can be granted.  Fed. R.

Civ. P. 12(b)(6).  In assessing a motion to dismiss, a court "must assume [factual allegations] to be

true," *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 93 (2d Cir. 2007), but a plaintiff's

"'factual allegations must be enough to raise a right of relief above the speculative level,' making

the plaintiff's claim 'plausible on its face.'"  *Brown v. Castleton State Coll.*, 663 F. Supp. 2d 392,

395 (D. Vt. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).  "[A]

complaint that merely 'tenders naked assertions devoid of further factual enhancement' fails to meet

this standard."  *Gallop v. Cheney*, 642 F.3d 364, 367 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 129

S. Ct. 1937, 1949 (2009)).  "[A] plaintiff's obligation to provide the grounds of his entitlement to

relief requires more than labels and conclusions, and a formulaic recitation of the elements of a

cause of action will not do."  *Twombly*, 550 U.S. at 555 (internal quotation marks omitted).

Plaintiff's state law claims – which consist of "naked assertions" that do no more than second-guess

the business judgment of the Board – do not meet these standards.

A.      Vermont's Statutory Scheme

The duties of directors under Vermont law are codified in 11A V.S.A. § 8.30, which

requires a director to discharge her duties "in good faith," "with the care an ordinarily prudent

person in a like position would exercise under similar circumstances," and "in a manner the director

believes to be in the best interests of the corporation."  *Id.* § 8.30(a).  The statute further provides

---

*Corp.*, 216 Fed. Appx. 14, 16-17 (2d Cir. 2007); *Tiberius Capital, LLC v. PetroSearch Energy
Corp.*, 2011 WL 1334839, at *8 (S.D.N.Y. 2011).  Because Plaintiff fails to allege a primary
violation of Section 14(a), Plaintiff's Section 20(a) claim must also be dismissed.

that "[a] director is not liable for any action taken as a director, or any failure to take any action, if the director performed the duties of his or her office in compliance with this section." *Id.* § 8.30(d). Thus, absent allegations indicating bad faith or actions prompted by self-interest rather than corporate best interests, a director who exercises "care" cannot be liable for breach of fiduciary duty under Vermont's statutory scheme. (*Id.*)

As the word "care" suggests, the "care" requirement is primarily a procedural one, *i.e.*, that directors make decisions in an informed and diligent manner. *See, e.g.*, *Roselink Investors, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 220 (S.D.N.Y. 2004) (the duty of care primarily requires directors to consider "all material information reasonably available to them."); *Dynamics Corp. of Am. v. WHX Corp.*, 967 F. Supp. 59, 66 (D. Conn. 1997) (applying New York law) (the "primary requirement of the duty of care" is to make "an informed decision") (citation omitted).[10]  The requirement of "care" does not provide Plaintiff (or the Court) with the right to second-guess the merits of decisions that have been carefully and deliberately made.  Rather, the well-recognized business judgment rule[11] "protects the decisions of the board of directors from judicial scrutiny, absent a showing that the board acted without due care, or with self-interest, bad faith or fraud."

---

[10] Where there is "little guidance from Vermont case law," Vermont courts have looked to "case law from other states to provide guidance in interpreting Vermont's law." *Towle v. Robinson Springs Corp.*, 719 A.2d 880, 882 (Vt. 1998).

[11] While Vermont has not had occasion to apply the business judgment rule in the corporate context, Vermont has recognized the business judgment rule in other contexts, specifically with respect to review of a board's decision to enforce condominium association rules.  *See Kinni Kinnic Vill., Inc. v. Saltis*, 2010 Vt. Super. LEXIS 61, at * 7-8 (Vt. Super. Apr. 6, 2010) (holding that application of the business judgment rule "prevents the Court from being put in the undesirable position of attempting to second-guess board decisions").  Additionally, states with virtually identical statutory schemes governing corporate directors have applied the business judgment rule.  *See Halebian v. Berv*, 457 Mass. 620, 627 n.11 (Mass. 2010) (holding that the business judgment rule "protects a [claim that a] corporation's decision...is not in the best interests of the corporation where the decision is made in good faith by independent decision makers after reasonable inquiry") (citing Mass Gen Laws 156D § 8.30); *Rosenfield v. Metals Selling Corp.*, 643 A.2d 1253, 1262 (Conn. 1994) (holding that the business judgment rule, as "codified in part" by Connecticut's applicable statute, is "a rule of law that insulates business decisions from most forms of review") (citing the previous, and substantially similar, version of Ct. Gen Stat. § 33-756).

13

*Shah v. Metro. Life Ins. Co.*, 2003 WL 728869, at *15 (N.Y. Sup. Feb. 21, 2003) (applying New York law) (dismissing complaint and noting that "[m]ere allegations that another course may have been more advantageous, is insufficient"); *see also Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988) ("directors are presumed to have acted properly and in good faith, and are called to account for their actions only when they are shown to have engaged in self-dealing or fraud, or to have acted in bad faith") (citation omitted); *Brehm v. Eisner*, 746 A.2d 244, 264 (Del. Supr. 2000) (stating that where the business judgment rule applies, courts do not "measure, weigh or quantify directors' judgment," and that "irrationality is the outer limit of the business judgment rule."). As discussed below, all that is pleaded here are illegitimate attempts to second-guess Board decisions made in its business judgment.

> B.    <u>Plaintiff Has Not Adequately Alleged The Existence of Bad Faith or Deliberate Disregard of Corporate Best Interests.</u>

Plaintiff has not adequately alleged either bad faith or action not believed to be in the best interests of CVPS. In order to survive a motion to dismiss a claim of "bad faith," Plaintiff must plead "specific factual allegations as to the conduct that constituted a breach of fiduciary duty." *Shah*, 2003 WL 728869, at *15 (dismissing complaint for failure to plead sufficient facts as to conduct that constituted a lack of good faith); *Marino v. Grupo Mundial Tenedora, S.A.*, 2011 WL 3837153, at *14 (S.D.N.Y. 2011) (dismissing complaint for failure to plead with "sufficient particularity that [defendants'] actions were committed in bad faith.") "Bad faith" is "not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will." *Roselink Investors, L.L.C.*, 386 F. Supp. 2d at 222 (internal citations and quotations omitted); *see also Rahbari v. Oros*, 732 F. Supp. 2d 367, 379 (S.D.N.Y. 2010). The Complaint contains no allegations adequately indicating the existence of any such misconduct here, and its conclusory attempts to

14

suggest otherwise are patently insufficient.  *See In re Merrill Lynch & Co., Inc., Sec., Derivative, & ERISA Litig.*, 773 F. Supp. 2d 330, 347 (S.D.N.Y. 2011) ("It is well-established that conclusory allegations [of bad faith] are insufficient to overcome the business judgment rule.")

Nor, as discussed next, do the Complaint's allegations that the Directors had "conflicts" and were allegedly motivated by their own self-interest suffice.  (Compl. ¶¶ 53-57.)  Plaintiff's assertions regarding the Board's potential conflicts of interest are not only conclusory but legally baseless.

**The Gaz Métro Merger.** With respect to the Gaz Métro Merger, the Complaint contains two apparent allegations of conflicts.  As an initial matter, however, the mere existence of a potential conflict does *not* constitute a breach of fiduciary duty when, as here, the potential "conflict" is disclosed to shareholders in connection with a request for shareholder approval. Indeed, Vermont law explicitly permits shareholders to ratify conflicts of interest as long as they are properly disclosed to shareholders in materials submitted to them.  *See* 11A V.S.A. § 8.61; 11A V.S.A. § 8.63.  In other words, as long as arguable conflicts of interest are disclosed, CVPS's shareholders can decide for themselves whether any such conflicts affect the desirability of the merger.

In any event, Plaintiff's two attempts at suggesting a Board "conflict" in connection with the Gaz Métro Merger are each insufficient as a matter of law.  The first is a paragraph in the Complaint that does nothing more than copy and paste a table directly from the preliminary proxy (which is also in the final Proxy) reflecting ownership of CVPS stock and stock options by certain members of the CVPS Board and senior management.  (Compl. ¶ 55; Proxy, Ex. A, at 49.)  Aside from copying this table, the Complaint does not include any allegation as to how such stock ownership creates a conflict of interest.  (Compl. ¶ 55.)  Nor could it, as courts repeatedly and consistently hold that stock ownership does *not* create a conflict of interest; rather, it aligns the

15

interests of the Board and management with those of the shareholders. *Krim v. Pronet, Inc.*, 744 A.2d 523, 528 n.16 (Del. Ch. 1999) ("[t]he vesting of options does not create a conflict as a high exchange ratio for the [] shares benefits the option-holding directors as much as, if not more than, the regular stockholders."); *In re IXC Commc'ns, Inc. S'holder Litig.*, 1999 WL 1009174, at *6 (Del. Ch. Oct. 27, 1999) (dismissing plaintiff's claims and stating,"[p]laintiff has not demonstrated how the rational economic self-interest of the[] large shareholder[] [directors] differs from all [company] shareholders.")

Plaintiff's other allegation with respect to the Gaz Métro Merger relates to the "golden parachute" of Mr. Reilly (the CEO of CVPS and sole "inside" director).  Not only is this too fully disclosed in the Proxy, it likewise fails to create any conflict of interest affecting Board action.  That is because the other nine members of the Board are all *outside* directors, none of whom is alleged to have been controlled by Reilly, and none of whom is alleged to have derived any benefit from his personal compensation.[12]  Plaintiff cannot establish a conflict of interest affecting Board action without demonstrating that a *majority* of the Board members suffer from such a conflict.  *In re Lukens, Inc. S'holder Litig.*, 757 A.2d 720, 730 (Del. Ch. 1999) (granting motion to dismiss and holding that allegation that one of the directors was to received a "golden parachute," unaccompanied by any allegation that the board as a whole lacked independence, was insufficient to state a claim with respect to board action); *In re NYMEX S'holder Litig.*, 2009 WL 3206051, *6-7 (Del. Ch. Sept. 30, 2009) (allegations that two directors were to receive golden parachute compensation were insufficient to allege breach of fiduciary duty of loyalty).

---

[12] Although Plaintiff conclusorily suggests that the Gaz Métro Merger was somehow "driven" by Reilly's golden parachute compensation (Compl. ¶ 53), this compensation would have had to be paid in connection with the sale of CVPS to *any* third party, not just Gaz Métro.  (*See* Compl. ¶ 56; Proxy, Ex. A, at 51 (noting the total amount of the golden parachute payment "under a change in control").)  As such, it could not plausibly have driven the Board to favor Gaz Métro over any other bidder.

CH1 6148262v.8

**The Fortis Agreement.**  Plaintiff also futilely attempts to create the appearance of conflicts of interest with respect to the Fortis Agreement.  As an initial matter, Plaintiff's conflict of interest claims regarding the Board's stock ownership and Reilly's golden parachute fail for reasons already discussed above.  Plaintiff's additional conflict claims – that the Board and Reilly allegedly had conflicts due to their approving a transaction in which some of them would be retained by Fortis after the closing (Compl. ¶¶ 53-54) – fare no better.  Indeed, these claims are particularly ironic given that the Fortis transaction was ultimately terminated by the CVPS Board in favor of  the Gaz Métro Merger, under which neither Reilly nor any Board members will continue to serve.  (*See generally* Gaz Métro Agreement) (Ex. B.)  Moreover, as set forth below, the fact that some Board members would have been retained in connection with a Fortis transaction does not in any way support an unfounded leap that the Board members did not genuinely believe at the time that such a transaction was in the best interests of CVPS.  In any event, Plaintiff's retention claims are legally inadequate.

First, courts consistently hold that the mere fact that an acquiring entity agrees to retain certain board members does *not* suffice to create a legally cognizable conflict with respect to those board members.  *Orman v. Cullman*, 794 A.2d 5, 28-29 (Del. Ch. 2002) ("No case has been cited to me, and I have found none, in which a director was found to have a financial interest solely because he will be a director in the surviving corporation.  To the contrary, our case law has held that such an interest is not a disqualifying interest."); *Krim*, 744 A.2d at 528 n.16 (retention of board membership in merged entity "does not, standing alone, create a conflict of interest").  That is particularly so in the absence of any factual allegations that the compensation received for serving as a director is of financial significance to a given director, relative to his or her overall financial situation.  *Orman*, 794 A.2d at 27 (Plaintiff must allege that the benefit to the director is "significant enough *in the context of the director's economic circumstances*, as to have made it improbable that

17

the director could perform her fiduciary duties to the . . . shareholders without being influenced by her overriding personal interest.") (citation omitted, emphasis in original); *In re Freeport-McMoran Sulphur, Inc. S'holders Litig.*, 2001 WL 50203, at *5 (Del. Ch. Jan. 11, 2001) (complaint must allege that fees received by director are material to *that* director).  There are no such factual allegations here.  And, in any event, as previously discussed (p. 15, *supra*),  the Fortis merger required shareholder approval, and the specter of a purported "conflict of interest" creates no fiduciary breach where, as here, the approval sought is accompanied by full disclosure of the purported conflict.  (Proxy, Ex. A, at 29-30.)  11A V.S.A. § 8.61; 11A V.S.A. § 8.63.[13]

Second, Plaintiff's assertion that Reilly "appears to have been concerned to secure continued employment for himself and [CVPS's] senior management team" is also legally insufficient. (Compl. ¶ 53.)  As noted earlier, Reilly is but one member of the ten-person Board, the other nine of whom are independent with no interest in Reilly's continued employment.  Absent a *majority* of the Board being shown to have sacrificed the Company's best interests in favor of their own, no claim of fiduciary breach based on Board action can survive.  *See* cases cited at p. 16, *supra*; *see also In re E.F. Hutton Banking Practices Litig.*, 634 F. Supp. 265, 270 (S.D.N.Y. 1986) (allegations that certain directors of the board were self-interested were insufficient where the self-interested directors did not constitute a majority of the board).

      C.     <u>Plaintiff's Allegations of Breaches of The Duty of Care in Connection with the Process and Terms of the Gaz Métro Merger Fail to Overcome The Presumption of Due Care Under The Business Judgment Rule.</u>

That leaves the duty of "care," the third of the three duties imposed by the Vermont statute. 11A V.S.A. § 8.30.  Plaintiffs' "care" claims fall into two categories:  (1) claims of fiduciary breaches in connection with the now-terminated Fortis transaction; and (2) claims of breaches

---

[13] It also bears noting that, as disclosed in the Proxy Statement, at the time the Board accepted the Fortis offer, the other two bidders had offered to retain *all* members of the CVPS Board of Directors.  (Proxy, Ex. A, at 29.)

pertaining to the Gaz Métro Merger.  As discussed below, all of these claims amount to no more than illegitimate second-guessing.

>    1.    *Plaintiff's claims relating to the Fortis transaction.*

Plaintiff challenges several decisions relating to the now-terminated Fortis transaction – without, however, alleging anything at all regarding the "care" attendant to those decisions.  *First*, Plaintiff questions the May 21, 2011 decision of the Directors "to exclude from the bidding process several parties that had approached the Company expressing interest in a possible transaction." (Compl. ¶ 49 (citing the description in the Proxy regarding this decision).)  But deciding not to consider these other parties does not reflect an absence of care.  Indeed, Plaintiff does not and cannot allege that this decision was made in an uninformed manner or without attentiveness.

As disclosed in the very Proxy discussion to which Plaintiff refers, the Board determined not to consider those other parties because it "concluded that none of such parties was likely to be prepared to pursue an acquisition of Central Vermont at a price more attractive than the proposals received from the bidding process being conducted through Lazard, and that the delay and attendant risks from beginning a new process with these third parties were therefore not merited."  (Proxy, Ex. A, at 27.)  In other words, the Board was unwilling to risk the proverbial "bird in the hand" by allowing the process to be delayed while new parties started from scratch the due diligence and other time-consuming processes that the existing bidders had already been through – with no reason to believe a superior offer would ultimately be forthcoming.  (Tellingly, Plaintiff does not allege that any of these other parties would likely have made a superior proposal.)  The Complaint does not allege that this explanation in the Proxy of the reasons for the Board's decision on this matter is inaccurate, much less provide a factual basis for any such claim.  Nor does the Complaint explain how this determination manifests a lack of "care."  Instead, Plaintiff's allegations questioning this decision are  "exactly the type of second-guessing which the business judgment rule was designed

to preclude." *Stamp v. Touche Ross & Co.*, 636 N.E.2d 616, 622 (Ill. App. Ct. 1993) (dismissing complaint that merely challenged business decisions, without alleging that defendants failed to make informed judgments or use due care in arriving at judgments). And, not surprisingly, courts have consistently rejected similar allegations. *See In re CompuCom Sys., Inc. S'holders Litig.*, 2005 WL 2481325, at *5-7 (Del. Ch. Sept. 29, 2005) (granting motion to dismiss claim for breach of fiduciary duties where board evaluated potential bidders and alternative options, and plaintiff did not allege that a better offer was available); *Hastings-Murtagh v. Tex. Air Corp.*, 649 F. Supp. 479, 484 (S.D. Fla. 1986) (finding that a board is under no duty to "jeopardize one bid in order to give…anyone else an indefinite amount of time in which to develop and finance an acquisition proposal."). *Cf. In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487, 501 (Del. Ch. 2010) (denying motion for preliminary injunction where board considered benefits and risks associated with potential suitors); *In re IXC Commcn's, Inc. S'holders Litig.*, 1999 WL 1009174, at *5 (denying preliminary injunction where the plaintiff had not "presented facts that would allow [the court] to conclude that the [] board did not exercise its best judgment in deciding which suitors merited serious consideration and which ones perhaps did not").

*Second*, Plaintiff claims that the Directors "prematurely" elected to enter into a "no-shop agreement" with Fortis on May 25, 2011. (Compl. ¶ 50.) This too has nothing to do with the "care" devoted by the Directors in making the decision; instead, it is merely another attempt to second-guess the business judgment of the Directors with conclusory rhetoric. And, once again, the Complaint does not challenge the accuracy of the description in the Proxy as to what occurred at this time; to the contrary, the Complaint cites the Proxy in this regard. (*Id.*) Yet as the Proxy itself discloses, (1) the Board had asked each of the bidders for its "best and final" offer by May 24, 2011; (2) Fortis had submitted an offer that was the highest monetary amount; (3) and Gaz Métro had declined to increase its prior offer or revise a portion of its draft merger agreement regarding

20

regulatory approvals that created significant deal uncertainty and which it had been specifically informed was problematic.[14]  (Proxy, Ex. A, at 28.)  Under these circumstances, it was a classic exercise in business judgment for the Board to decide to end the auction (as it had told the bidders), and that decision does not in the least indicate some lack of "care."[15]  *See, e.g., In re Toys "R" Us, Inc.*, 877 A.2d 975, 1009 (Del. Ch. 2005) ("[T]he decision to time limit the final auction process cannot be deemed unreasonable given the length of the process to date and the risk of losing one of the finalists."); *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 576 (11th Cir. 1988) ("All auctions must end sometime, and lock-ups by definition must discourage other bidders…These are not the kind of actions that amount to an abuse of discretion.")  Accordingly, Plaintiff's claim that the Board "prematurely" entered into an agreement with Fortis does not state a claim.[16]

*Third*, Plaintiff asserts that the Directors somehow breached their duty of care by

---

[14] As mentioned earlier (p. 5, *supra*), in its proposals at this time Gaz Métro insisted on including in its draft of a merger agreement provisions which "allowed Gaz Métro *to terminate the agreement without penalty* if conditions imposed in regulatory approvals had a material adverse effect on Gaz Métro's (unspecified) expected benefits from the transaction."  (Proxy, Ex. A, at 27) (emphasis added).  Courts have repeatedly recognized that in determining which of competing proposals is superior, a Board is entitled to take into account potential deal risk associated with a given proposal.  *See, e.g., Beck v. Dobrowski*, 559 F.3d 680, 684 (7th Cir. 2009) (rejecting argument that shareholders were harmed when Board agreed to an offer having greater certainty but that was alleged to be at a slightly lower price); *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 614-16 (Board did not breach fiduciary duties by considering deal certainty in addition to price).

[15] Moreover, the Board did not agree to bind itself to Fortis irrevocably and unconditionally.  Instead, it left itself an "out" in the event that it received a superior offer from another company.  This provision, which is also included in paragraph 5.4(b) of the Gaz Métro Agreement, provides that the Board may conduct discussions with the sponsor of an unsolicited "Acquisition Proposal" if it "determines in good faith, after consultation with its financial advisors and outside counsel, that such Acquisition Proposal constitutes or is reasonably likely to lead to a Superior Proposal."  (Fortis Agreement ¶ 5.4(b), *available at* http://www.sec.gov/Archives/edgar/data/18808/000001880811000019/ex2_1.htm (Ex. C); Proxy, Ex. A at 28.)

[16] Plaintiff also suggests that the Directors breached their duty of care by agreeing to a termination fee in the Fortis Agreement, which was then paid after CVPS terminated the Fortis Agreement, allegedly to the detriment of CVPS shareholders.  (Compl. ¶ 58.)  As discussed below (see pp. 24-25, *infra*), courts regularly uphold termination fee provisions.

considering constituencies other than the shareholders in determining to enter into an agreement with Fortis.  (Compl. ¶¶ 45, 50.)  Indeed, Plaintiff goes so far as to assert that "Defendants admit in the proxy that they did not seek to maximize shareholder value when considering the Proposed Fortis Transaction."  (Compl. ¶ 50.)  But the Proxy says no such thing.  To the contrary, it states that when the Board chose Fortis, *all* factors favored its proposal, including price considerations, deal certainty and regulatory approval considerations *and* benefit to other constituencies.  (Proxy, Ex. A, at 27-29.)

In any event, there is nothing at all improper about considering other constituencies under Vermont's statutory scheme.  To the contrary, Vermont's governing statute is explicit that in determining the best interests of the corporation, a director may consider the interests of multiple constituencies, including "employees, suppliers, creditors, and customers, the economy of the state, region and nation, community and societal considerations…and any other factors the director in his or her discretion reasonably…believes to be in the best interests of the corporation…."  11A V.S.A. § 8.30(a)(3).  Plaintiff's allegations to the contrary appear to be based on the Delaware Supreme Court's decision in *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986), which held that once a board decides to put a company up for sale, the directors are "charged with getting the best price for the stockholders at a sale of the company."  *Id.* at 182.  But the Vermont statute was amended to include its "other constituency" provision in 1998, well after *Revlon*, and was designed to create a very different rule.[17]  As a district court in Wisconsin recently explained in rejecting similar allegations in the face of a similar "other constituency" statute:

> The Wisconsin Legislature enacted [the constituency statute] after *Revlon*, and it specifically authorizes corporate directors to consider more than just shareholders in executing their duties.  Such a provision is in direct conflict with a rule that would require directors to focus

---

[17] The Vermont Attorney General has opined that it must be assumed that the legislature was aware of *Revlon* when making this amendment.  Op. Vt. Att'y Gen. No. 2000-2, 2000 WL 34416663 (March 22, 2000).

22

solely on maximizing value for the benefit of shareholders.  Thus, *Revlon* cannot be the rule in Wisconsin.

*See Dixon v. Ladish Co., Inc.*, 2011 WL 1219256, *5 (E.D. Wis. Mar. 30, 2011).[18]  The same is true in Vermont.

2.   *Plaintiff's Claims Relating to the Gaz Métro Merger.*

**Price Inadequacy.**   Plaintiff claims that the merger consideration of $35.25 per share is inadequate because "among other things, the intrinsic value of Central Vermont's common stock is materially in excess of [that price] . . . given the Company's prospects of future growth and earnings."  (Compl. ¶ 48; s*ee also id.* ¶¶ 3, 41, 44, 46.)  But Vermont law, like the law of other states, provides that whether the merger consideration is "adequate" compared to the so-called "intrinsic value" of CVPS is precisely what the shareholders will consider in voting on the Gaz Métro Merger.  *See* 11A V.S.A. § 11.03; *see also In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 123 (Del. Ch. 2007) ("[T]he plaintiffs are in no position[to] ask me to refuse the [] electorate the chance to freely determine whether a guaranteed [amount] per share right now is preferable to the risks of continued ownership of [the] stock.").  Moreover, Plaintiff's conclusory assertion of price inadequacy is just another attempt to second-guess the Directors' business judgment and has nothing to do with the issue of their "care."[19]  Not only is that legally insufficient, the attempt is particularly inappropriate here given that the proposed purchase price represents a 45% premium

---

[18] Courts in other jurisdictions with "other constituency" statutes have similarly rejected application of *Revlon* duties.  *Cf. Abrahamson v. Waddell*, 624 N.E.2d 1118 (Ohio Ct. Common Pleas 1992) (dismissing shareholder's suit against corporate directors seeking damages for their rejection of an acquisition offer based on Ohio's constituency statute); *AMP Inc. v. Allied Signal Inc.*, 1998 WL 778348 (E.D. Pa. Oct. 8, 1998); *Georgia-Pacific Corp. v. Great N. Nekoosa Corp.*, 727 F. Supp. 31, 33 (D. Me. 1989).

[19] The Complaint does not even identify the purported "intrinsic value" of CVPS, much less provide any plausible factual basis for its rhetoric of an "inadequate" price.  That is yet another reason why these allegations are insufficient. *See, e.g., Monroe County Emp. Ret. Sys. v. Carlson*, 2010 WL 2376890 (Del. Ch. June 7, 2010) (dismissing complaint that alleged transactions occurred at an unfair price but which did not identify the alleged fair price).

23

over the closing price of CVPS stock on the day prior to the announcement of the Fortis Agreement. (*See* Compl. ¶ 47 (quoting May 30, 2011 Press Release).)  *See, e.g., Globis Partners, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024 (Del. Ch. Nov. 30, 2007) (dismissing complaint alleging breach of fiduciary duties for failure to obtain adequate price); *In re CompuCom Systems, Inc. S'holders Litig.*, 2005 WL 2481325 (dismissing complaint that included allegations of inadequate price where price per share was below market price at time of sale).

**Deal Provisions.**  Plaintiff alleges that the Defendants breached their fiduciary duties by allowing several purported "preclusive deal protection devices" to be included in the Gaz Métro Agreement.  (Compl. ¶¶ 58-66.)  These are the same deal terms contained in the Fortis Agreement – which obviously did not prove "preclusive."  In any event, Plaintiff's allegations about these provisions fail as a matter of law.

As an initial matter, Plaintiff alleges that the termination fee of $17.5 million plus reimbursement for up to $2 million in expenses under the Gaz Métro Merger, which represents "2.8% of the approximate deal value of $700 million," is "unreasonably high for this type of transaction."  (Compl. ¶ 65.)  Plaintiff does not even conclusorily allege that the Directors failed to adequately inform themselves about the termination fee provision before agreeing to it, however. Thus, Plaintiff is again just second-guessing the Board and its negotiating results.  And, contrary to Plaintiff's assertion, this type of provision (including the amount of the termination fee) is not the least bit unusual.  Indeed, courts regularly dismiss allegations regarding termination fees significantly higher than the termination fee here.  *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 614 (Del. Ch. 2010) (finding 3.9% termination fee a "relatively insubstantial barrier" to a topping bid); *In re 3Com S'holders Litig.*, 2009 WL 5173804, at *7 (Del. Ch. Dec. 18, 2009) (finding termination fee in excess of 4% to be a "standard merger term" that has been "repeatedly" upheld); *Gut v. MacDonough*, 2007 WL 2410131, at *15 (Mass. Super. Aug. 14, 2007) (merger agreement

24

was not unfair or unreasonable because it contained a termination fee of 5%); *Jasinover v. Rouse Co.*, 2004 WL 3135516, at *10 (Md. Cir. Ct. Nov. 4, 2004) (approving a transaction with a termination fee within the normal range of 2% to 4%); *In re Pennaco Energy, Inc.*, 787 A.2d 691, 707 (Del. Ch. 2001) (rejecting challenge to a 3% termination fee); *Goodwin v. Live Entm't, Inc.*, 1999 WL 64265, at *20 (Del. Ch. Jan. 25, 1999), *aff'd*, 741 A.2d 16 (Del. 1999) (termination fee amounting to 3.125% "is commonplace and the amount is within the range of reasonableness approved by this court in similar contexts"). Thus, Plaintiff's allegations regarding the purportedly "unreasonably high" termination fee fail as a matter of law.

Plaintiff also alleges that agreeing to what is known as a "matching rights" provision was somehow a breach of the Directors' fiduciary duties. Under that provision, if the Board determines that a proposal from a third party constitutes a "superior proposal," it must notify Gaz Métro and provide it an opportunity to match the "superior proposal." (Compl. ¶ 63.) Again, however, there are no allegations indicating that the Board was not adequately informed about or did not carefully consider this provision. Instead, this is simply another instance of Plaintiff's attempting to second-guess the Board's decision to agree in the context of a negotiated transaction, to include a standard deal term that courts regularly uphold as a matter of law. *See In re Smurfit-Stone Container Corp. S'holder Litig.*, 2011 WL 2028076, at *21 (Del. Ch. May 20, 2011) (finding a no shop provision, a matching rights provision, and the termination fee to be "relatively standard in form"); *In re Toys "R" Us S'holder Litig.*, 877 A.2d at 1017 (characterizing a matching rights provision as "a common contractual feature").

Finally, Plaintiff challenges provisions in the Gaz Métro Agreement that restrict the Directors from soliciting other proposals and engaging in discussions or negotiations regarding "alternative tender offers or business combinations." (Compl. ¶¶ 60-61; *see also* Gaz Métro Agreement, Ex. B, at § 5.4(a) (discussed in Compl. ¶ 60).) These restrictions are not, however,

absolute; rather, the Gaz Métro Agreement also contains "fiduciary out" provisions which allow CVPS to enter into discussions and negotiations in response to an unsolicited competing bid if the Board "determines in good faith that the proposal is reasonably likely to lead to a Superior Proposal."  (Compl. ¶ 62; Gaz Métro Agreement, Ex. B, at 5.4(b).)  As with all of his other alleged breaches of care, Plaintiff does not even remotely suggest that the Board was inadequately informed before agreeing to these provisions.  Instead, he is, once more, simply second guessing the Board's business judgment.  And, once again, doing so is entirely insufficient to state a claim.  Indeed, courts regularly reject breach of fiduciary duty claims relating to no-shop provisions. *Gut*, 2007 WL 2410131, at *15 (denying preliminary injunction, noting, "'No Talk/No Shop' clauses and termination fees are not uncommon in merger agreements"); *Ace Ltd v. Capital Re Corp.*, 747 A.2d 95, 106 (Del. Ch. 1999) ("No-shop" clauses are "perfectly understandable, if not necessary, if good faith business transactions are to be encouraged"); *In re Lukens*, 757 A.2d at 725 (dismissing claims challenging no-solicitation provision); *In re Pennaco Energy*, 787 A.2d at 707 (same).

**Alleged Non-Disclosures.**  Finally, Plaintiff alleges that the Directors violated their disclosure duties in connection with the Gaz Métro Merger by failing to disclose a litany of additional details about Lazard's analysis and the sales process.  (Compl. ¶¶ 71-73.)  As discussed above, Plaintiff's federal law claims regarding inadequate disclosures in the Proxy must be dismissed because the Complaint does not adequately allege any failure to comply with Section 14(a).  Plaintiff now seeks to turn Vermont law into a means of modifying and expanding the federal proxy statement requirements by claiming that state law fiduciary obligations somehow require additional disclosures even if federal law does not.  There is, however, no basis in Vermont case law or statutory law for imposing such obligations, especially absent a showing that directors' judgments about the level of disclosure detail were made either in bad faith, contrary to what the director believed to be the company's best interests or without "care."  11A V.S.A. § 8.30(a).

26

Moreover, it is always possible for a creative plaintiff to construct a complaint asking for disclosure of additional details.  If that were all it took to sufficiently state a disclosure violation claim, every proxy statement would be subject to endless attack.  But that is not the standard, even in those jurisdictions that elect to impose additional state law disclosure obligations.  Instead, even those jurisdictions limit their requirements to "material" information.  For an omission to be material, a plaintiff must prove that: (1) it is substantially likely that the omitted information would be sufficiently important to assume "actual significance" in a stockholder's deliberations, and (2) the information which Plaintiff seeks to have disclosed must significantly alter the "total mix of information" already available to stockholders.  *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 143 (Del. 1997) (emphasis added).  Because "the burden of demonstrating materiality rests with the plaintiffs," *Globis Partners,* 2007 WL 4292024, at *10, a plaintiff must allege "why [the omitted facts] meet the materiality standard and how the omission caused injury."  *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1173 (Del. 2000); *Wayne County Employees Ret. Sys. v. Corti*, 954 A.2d 319, 330 (Del. Ch. 2008).

Significantly, merely alleging that information "might be helpful" to stockholders or that a shareholder would conceivably be interested in this information does not satisfy the burden of pleading materiality.  *In re Siliconix S'holders Litig.*, 2001 WL 716787, at *9 (Del. Ch. June 19, 2001) ("Delaware law does not require disclosure of 'all available information simply because available information might be helpful.'") (quoting *Skeen*)).  Indeed, it is well settled, for instance, under Delaware law (which is different than Vermont's statutory scheme) that directors are not required to "'bury the shareholders in an avalanche of trivial information.  Otherwise, shareholder solicitations would become so detailed and voluminous that they will no longer serve their purpose.'"  *In re Gen. Motors (Hughes) S'holder Litig.*, 2005 WL 1089021, at *13 (Del. Ch. May 4, 2005) (citation omitted), *aff'd* 897 A.2d 162 (Del. 2006); *Zirn v. VLI Corp.*, 1995 WL 362616, at *4

27

(Del. Ch. June 12, 1995); *aff'd* 681 A.2d 1050 (Del. 1996) (rejecting the "fallacy that increasingly detailed disclosure is always material and beneficial" and recognizing "[i]n some instances the opposite will be true.")  Thus, for example, a "play-by-play description of merger negotiations" is not required.  *Globis Partners*, 2007 WL 4292024, at *14.  And it is well recognized that information that merely corroborates existing proxy disclosures is not material because it does not meaningfully "alter" the total mix of information and would not be substantially likely to assume "actual significance" in a reasonable stockholder's deliberations.  *See id.* at *11 (The duty to disclose "does not require directors to provide financial information merely helpful or cumulative to other information that was provided.") (citation omitted); *Abrons v. Maree*, 911 A.2d 805, 813 (Del. Ch. 2006) ("[c]onsistent and redundant facts do not alter the total mix of information"); *In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487, 511-12 (Del. 2010) (While plaintiffs may always "request just one more piece of information," additional information would not "alter the total mix of information" given information already provided to shareholders.).  Because the Complaint does not contain any well-pled allegations explaining why the omitted material would have assumed actual significance in a shareholder's decision-making with respect to voting on the Gaz Métro Merger, as opposed to simply constituting additional corroborative details, the disclosure claims fail as a matter of law.  In addition, many of the purported "omissions" identified by Plaintiff are, in any event, disclosed in the Proxy.  Accordingly, Plaintiff's disclosure allegations should be dismissed.

**Lazard's Analysis and Opinion.**  The Proxy Statement includes nine single-spaced pages explaining the five different valuation methodologies, and their results, used by Lazard in connection with the rendering of its fairness opinion.  (*See* Proxy, Ex. A, at 38-47.)  The Complaint's requests for yet more detail about Lazard's work (as set forth in paragraph 72 of the Complaint) are meritless for two reasons.

First, as the table below makes clear, much of the allegedly omitted information is actually

disclosed in the Proxy.

| Alleged Omission | Proxy Statement Disclosure |
|---|---|
| The criteria to select the companies and multiples used (Compl. ¶72(a)(i)) | Lazard reviewed and analyzed certain financial information, valuation multiples, and market trading data relating to selected publicly traded regulated electric utility companies whose operations Lazard believed, based on its experience with companies in the regulated electric utility industry to be similar to Central Vermont's operations for purposes of this analysis.  (Proxy, Ex. A, at 40.) |
| The rationale to apply particular reference ranges to the Company's estimated EPS for the calendar years 2011 and 2012 (Compl. ¶ 72(a)(ii)) | "The calendar year 2011 and 2012 estimated EPS for each of the Central Vermont comparable companies used by Lazard in its analysis were based on I/B/E/S, which represents publicly available consensus [analyst] estimates….Based on an analysis of the relevant metrics for each of the Central Vermont comparable companies, Lazard selected a reference range of 13.0x to 15.0x for share price to 2011 estimated EPS and 12.0x to 14.0x for share price to 2012 estimated EPS.  (Proxy, Ex. A, at 41.) |
| The rationale for selecting a discount rate of 7.35% in 2011 and a discount rate of 7.95% starting in 2013 (Compl. ¶ 72(b)(ii)) | The discount rate was based on the midpoint of Lazard's judgment of the estimated range of weighted average cost of capital, based on treasury rates assumed in the Central Vermont management case (defined in Proxy at 41) and analyses of the Central Vermont comparable companies.  (Proxy, Ex. A, at 42.) |
| The rationale for selecting certain cost of equity and pre-tax cost of debt ranges (Compl. ¶ 72(b)(iii)-(iv)) | [These numbers were] determined with reference to the Central Vermont management case and analyses of the Central Vermont comparable companies, with a ratio of equity to total capitalization ranging from 50% to 60%. (Proxy, Ex. A, at 42.) |
| The rationale for selecting exit EBITDA multiples ranging from 7.75x  to 8.25x (Compl. ¶ 72(b)(vi) | The exit EBITDA multiples were selected by Lazard by reference to enterprise value to EBITDA trading multiples calculated for Central Vermont as well as the enterprise value to EBITDA trading multiples of the Central Vermont comparable companies.  (Proxy, Ex. A, at 42.) |
| The rationale for selecting certain exit P/E multiples (Compl. ¶ 72(b)(vii) | The exit P/E multiples were selected by Lazard by reference to P/E multiples calculated for Central Vermont as well as the P/E multiples of the Central Vermont comparable companies.  (Proxy, Ex. A, at 42.) |
| The rationale for selecting certain equity discount ranges, cost of equity capital, and amounts of dividends (Compl. ¶ 72(c)) | To arrive at an appropriate equity discount rate range for Central Vermont, Lazard analyzed the cost of equity capital for the Central Vermont comparable companies.  The average amount of annual dividend growth and the expected 2011 dividend per share used for the years 2011 through 2015 were based  on the Central Vermont management case.  The dividend growth rate range and the expected 2015 dividend per share used for the years subsequent to 2015 were also based on the Central Vermont management case.  (Proxy, Ex. A, at 43.) |
| The rationale for selecting | The average amount of annual dividend growth used for the years |

| Alleged Omission | Proxy Statement Disclosure |
|---|---|
| certain dividend growth ranges (Compl. ¶ 72(d)) | 2011 through 2015 and the dividend growth rate range and the expected 2015 dividend per share used for the years subsequent to 2015 were based  on the Central Vermont management case, as adjusted by Central Vermont as described above.  (Proxy, Ex. A, at 43.) |
| The rationale for selecting the companies used and to rely in the analysis on a majority of the transactions that occurred between June 1999 through 2009 (Compl. ¶ 72(e)(i)) | Lazard reviewed and selected precedent merger and acquisition transactions involving companies in the electric utilities industry it viewed as comparable to Central Vermont.  In performing these analyses, Lazard reviewed certain financial information and transaction multiples relating to the companies involved in the selected transactions and compared such information to the corresponding information for Central Vermont.  Specifically, Lazard reviewed 25 merger and acquisition transactions since June 1999 involving companies in the electric utilities industry for which sufficient public information was available.  (Proxy, Ex. A, at 43.) |
| The rationale to apply certain P/E multiples ranges  and discount rates (Compl. ¶ 72(e)(iii)-(iv) | The 2011, 2012 and 2015 estimated EPS for Central Vermont were based  on the Central Vermont management case, and Lazard selected an appropriate equity discount rate by analyzing the cost of equity capital for the Central Vermont comparable companies.  (Proxy, Ex. A, at 45.) |
| CVPS's unlevered free cash flows or the key inputs necessary to reach key cash flows (Compl. ¶ 73) | The following table sets forth the estimated unlevered free cash flow as calculated by Lazard for years 2011 through 2015. (Proxy, Ex. A, at 42.) |

Second, even as to those few items Plaintiff has identified that were not included in the

Proxy, Plaintiff has not adequately alleged *why* and in what way this additional information would

be material to a shareholder.  Plaintiff conclusorily asserts that the omitted information is

"necessary for shareholders to evaluate and properly assess the credibility of the various analyses

performed by Lazard and relied upon by the Board in recommending the" Gaz Métro Merger.

(Compl. ¶ 72.)  But the law "does not require disclosure of all the data underlying a fairness opinion

such that a shareholder can make an independent determination of value."  *Globis Partners*, 2007

WL 4292024, at *13; *see also In re Bear Stearns Litig.*, 870 N.Y.S.2d 709, 738 (N.Y. Sup. Ct.

2008); *Abbey v. E.W. Scripps Co.*, 1995 WL 478957, at *3 (Del. Ch. Aug. 9, 1995) ("all of the work

and consideration that enter into the ground leading to [an investment banker's] opinion

30

will…rarely if ever be material"); *In re Genentech Inc. S'holders Litig.*, 1990 WL 78829, at *8 (Del. Ch. June 6, 1990) (no obligation to disclose the "breadth of the ranges of values [used by the investment bankers] and the underlying information on which they are based").  Rather, all that is required is a fair ***summary*** of the financial advisor's valuation work, which is precisely what is set forth in the Proxy.  *See In re JCC Holdings Co. S'holder Litig.*, 843 A.2d 713, 722 (Del. Ch. 2003) ("[b]y setting forth a fair summary of the valuation work [the investment banker] in fact performed, the board met its obligations under our law").  Plaintiff's claims for additional disclosures regarding Lazard's analysis are legally groundless.

**Sales Process.**  The Proxy Statement includes fourteen pages extensively setting forth the "Background of the Merger" and the Board's reasons for recommending shareholder approval of the Gaz Métro Merger.  (*See* Proxy, Ex. A, at 24-38.)  Yet Plaintiff conclusorily claims that this is not enough, alleging  that "the Proxy fails to disclose sufficient information regarding the sales process leading up to the Proposed Transaction."  (Compl. ¶ 71.)  These claims are deficient for reasons similar to those discussed above.  Again, all that is required is a fair summary, not a "play-by-play description of merger negotiations." *Globis Partners*, 2007 WL 4292024, at *14.  That Plaintiff has conjured up random tidbits of other information that he would allegedly like to know does not state a disclosure violation claim.

As an initial matter, at least one category of purportedly omitted information was actually disclosed in the Proxy.  Specifically, Plaintiff alleges that the Proxy fails to disclose "[t]he basis for the Board's decision to enter into the Fortis Agreement on May 27, 2011."  (Compl. ¶ 71(j).)  However, the Proxy contains two pages discussing the background to and reason for that very decision.  (Proxy, Ex. A, at 28-30.)

Plaintiff's remaining allegations fare no better.  *First*, much of the additional information sought by Plaintiff consists of answers to questions Plaintiff poses about  "why" certain things were

done or occurred as they did.[20] (Compl. ¶ 71(a) and (h).)  "Why" claims of this sort cannot survive a motion to dismiss.  *See In re Sauer-Danfoss Inc. S'holders Litig.*, 2011 WL 2519210, at \*11-12 (Del. Ch. May 3, 2011) ("[a]sking 'why' does not state a meritorious disclosure claim."); *In re Bear Stearns Litig.*, 870 N.Y.S.2d at 738 ("A plaintiff may not make out a disclosure claim merely by 'pos[ing] questions that are not answered in the proxy statement'") (citation omitted); *Newman v. Warren*, 684 A.2d 1239, 1246 (Del. Ch. 1996) (noting the inherent difficulty in stating the "reason" why a group composed of a number of individuals did or did not do something, and stating that the law of fiduciary disclosure "requires full and candid disclosure of *all material facts*.  It does not in my opinion require in addition that individual directors state (or the corporation state for them) the grounds of their judgment for or against a proposed shareholder action.") (internal citations omitted) (emphasis in original).

        *Second*, Plaintiff's complaints regarding a failure to disclose the number of strategic versus financial buyers are also without merit.  (Compl. ¶¶ 71(b) and (g).)  The Complaint contains no allegation explaining why such information is material, or how it could possibly affect a shareholder's decision as to which way to vote on the proposed Gaz Métro Merger.  Instead, this is simply another demand for disclosure of details of a sort consistently rejected by the courts. *McMillan v. Intercargo*, 1999 WL 288128, at \*8-9 (Del. Ch. May 3, 1999) (denying plaintiff's application for a preliminary injunction based upon plaintiff's argument that the proxy "should have disclosed the identity of the companies evaluated, the number and identity of the companies contacted, whether the companies evaluated and/or contacted included those that were likely to be

---

[20] Not only does Plaintiff claim that CVPS should have disclosed its reasons for taking certain actions, he has also developed the novel notion that the Proxy Statement should disclose the reasons the Board did *not* do something.  (*See, e.g.,* Compl. ¶ 71(a) (seeking disclosure as to the Board's "reasons for not forming a special committee").)  Not only is the inquiry an inappropriate one with respect to the Proxy,  it is well-established that a special committee is "of no practical or legal significance" when, as here, a majority of the Board is not conflicted.  *Emerald Partners v. Berlin*, 2003 WL 21003437, at \*22 (Del. Ch. April 28, 2003).

CH1 6148262v.8

interested in [the target], and how many of those companies contacted signed confidentiality agreements," holding that this information was not material and that it was sufficient that the "Proxy Statement adequately discloses the process that [the target] and its financial advisor employed to seek out prospective purchasers.")

*Third*, the Complaint seeks disclosure of the "content of the discussions" at various dinner meetings and conversations, all of which occurred long before the June 23, 2011 Gaz Métro proposal and subsequent entry into the Gaz Métro Agreement.  (Compl. ¶ 71(d)-(f), (i)).[21]  Once again, however, the Complaint makes no effort to explain why this level of detail would be substantially likely to assume "actual significance" in a stockholder's consideration of whether to accept the Gaz Metro Merger – a proposed transaction that contains the highest price offered by any entity *and* which does not include the agreed retention of any of the Directors.  *Cf. Goodwin v. Live Entm't, Inc.*, 1999 WL 64265, at *19 (Del. Ch. Jan. 25, 1999) *aff'd*, 741 A.2d 16 (Del. 1999) (granting summary judgment in favor of defendants on plaintiff's disclosure claims and stating that information about directors' and officers' continued employment had nothing to do with a shareholder's determination as to whether the price per share was a good price).

*Fourth*, Plaintiff complains of the Proxy's failure to disclose with greater specificity the nature of other "shareholder value creation opportunities" considered by the Board at certain of its

---

[21] Plaintiff does not (and cannot) affirmatively allege that Reilly's continued employment was actually discussed by him at any of these meetings but merely raises a speculative question.  Even if the answer was "yes," though (and any such assumption is improper), the additional disclosure would be immaterial for two other reasons.  First, the Gaz Métro Agreement, which is the one that is the subject of the upcoming shareholder vote, does not contain any agreement for retention of Mr. Reilly and, as the Proxy discloses, he is not being retained.  (Proxy, Ex. A, at 31; *see generally* Gaz Métro Agreement, Ex. B.)  Second, the fact that there was some discussion of potential retention of management at points during the sales process is not a secret – indeed, the Fortis Agreement specifically included such provisions and the Proxy indicates that this was among matters discussed.  Accordingly, additional details as when this topic was or was not discussed in no way alters the "total mix" of information already available, much less in a way pertaining to the transaction that is now on the table.

meetings.   (Compl. ¶ 71(c).)  But the other alternatives are generally described in the portion of the Proxy discussing the Board's reasons for its recommendation, i.e., "continued growth as a stand-alone company and the potential to acquire, be acquired or combine with other third parties….." (Proxy, Ex. A, at 34.)  And what matters are not the specifics of these hypothetical alternatives – the disclosure of which would do nothing more than reveal confidential strategic information that could compromise CVPS in the event the Gaz Métro Agreement were not approved – but the fact that none of these opportunities offered economic outcomes superior to those of  the Gaz Métro Merger, a determination that is clearly disclosed in the Proxy.  (*Id.*)  Tellingly, Plaintiff does not contest the accuracy of this determination.  Under these circumstances, providing additional detail would serve no purpose other than to corroborate.  That does not suffice to state a disclosure claim.

*Fifth*, Plaintiff poses mere questions about whether the Board required Lazard to disclose the nature if its holdings in CVPS, Fortis and/or AES [sic] at the time of retention (Compl. ¶ 71(k)) and what procedures established for Lazard and Reilly to negotiate conflict free (*id.* at ¶ 71(l).)  These too are not properly pled disclosure claims; a Proxy is not a Q&A session.  Moreover, Plaintiff has not even alleged that there was any conflict of interest by Lazard, much less a material one.  And Lazard's fairness opinion itself discloses certain activities that it or its affiliates engage in, including potentially trading or holding positions in certain securities of CVPS or Gaz Metro. (Proxy, Ex. A, at Annex B.)

In short, Plaintiffs fiduciary duty claims based on purported omissions must be dismissed.[22]

----

[22] Because the Complaint fails to allege any underlying breach of fiduciary duty by the Directors, the claim in Count III that CVPS aided and abetted such fiduciary duty breaches must be dismissed as well.  *Lefkowitz v. Bank of New York*, 676 F. Supp. 2d 229, 263 (S.D.N.Y. 2009) (Dismissing aiding and abetting claim on the grounds that "plaintiff does not plead a cognizable primary fiduciary breach.  Necessarily, then, her claim for aiding and abetting those purported breaches must also fail."); *DeBlasio v. Merrill Lynch & Co., Inc.*, 2009 WL 2242605, at *32 (S.D.N.Y. July 27, 2009) (Dismissing aiding and abetting claim, stating "Plaintiffs have not identified a 'primary violator' because they have not adequately pleaded a claim for breach of fiduciary duty.  Such allegations are a predicate to their claims . . .  for aiding and abetting a breach of fiduciary duty.")

34

## CONCLUSION

For the foregoing reasons, the CVPS Defendants respectfully request that this Court grant the instant motion and dismiss Plaintiff Howard Davis' Amended Complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).

/s/ R. Bradford Fawley
R. Bradford Fawley
Downs Rachlin Martin PLLC
Marlboro Technology Center
Fifth Floor
28 Vernon Street
Brattleboro, VT 05301
Phone: (802) 258-3070
Fax: (802) 258-4875

David F. Graham
Rachel B. Niewoehner
Kathleen L. Holthaus
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
Phone: (312) 853-7000
Fax: (312) 853-7036

*Counsel for Central Vermont Public Service Corporation, Lawrence J. Reilly, Robert L. Barnett, Robert G. Clarke, John M. Goodrich, Robert B. Johnston, Elisabeth B. Robert, William R. Sayre, Janice L. Scites, William J. Stenger, and Douglas J. Wacek*

CH1 6148262v.8

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 16, 2011, I electronically filed The CVPS Defendants'

Motion to Dismiss and Memorandum in Support of the CVPS Defendants' Motion to Dismiss with

the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the

following: A. Jeffry Taylor, Abatiell Associates, P.C., 1 Justice Square, Rutland, VT, 05701,

jeffryt905@yahoo.com.

<u>/s/ R. Bradford Fawley</u>
Downs Rachlin Martin PLLC
28 Vernon Street, Suite 501
Brattleboro, VT 05301
(802) 258-3070
bfawley@drm.com

CH1 6148262v.8